IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

6 2022

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:22-CR-00122 (RDA) |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 (Conspiracy) |
| | ) | |
| JULIO R. SOTOMAYOR | ) | Count 2: 18 U.S.C. §§ 201(b)(1) and 2 (Bribery) |
| (a/k/a "JACE SOTOMAYOR"; "J.R. | ) | |
| SOTOMAYOR"; "WIZARD"), | ) | Counts 3–6: 18 U.S.C. §§ 1343, 1346, and 2 |
| | ) | (Honest Services Wire Fraud) |
| Defendant. | ) | |
| | ) | Forfeiture Notice |

## INDICTMENT

July 2022 Term, Alexandria

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times material to this indictment:

1.       Defendant JULIO R. SOTOMAYOR (a/k/a "JACE SOTOMAYOR," "J.R.

SOTOMAYOR," and "WIZARD") was a retired colonel of the United States Air Force

("USAF").  Between in or about 2008 and in or about 2010, SOTOMAYOR worked at

Headquarters Air Force, A2, Intelligence, Surveillance, and Reconnaissance Directorate

("HAF/A2").  SOTOMAYOR thereafter created two independent consulting firms, EAGLE

MARKET GROUP ("EMG") and FEDERAL SECURITY AGENCY ("FSA"), which he owned

and operated as sole proprietorships in Alexandria, Virginia within the Eastern District of

Virginia.  SOTOMAYOR held himself out as a "Senior Advisor / Executive Consultant (IC)."

2.      Broadcasting Board of Governors ("BBG") was an independent federal agency that oversaw public service media networks, including Voice of America. The BBG changed its name to the U.S. Agency for Global Media ("USAGM") in or about August 2018.

3.      DIANE D. STURGIS was employed as a contract specialist and contracting officer for the BBG's International Broadcast Bureau, Office of Contracts from in or about November 2007 until at least in or about late September 2017. The Office of Contracts was responsible for soliciting, negotiating, awarding, and administering the BBG's contracts. STURGIS obtained an unlimited contract warrant, and her responsibilities included all aspects of the BBG's procurement process, including pre-solicitation negotiations, bid evaluations, contract awards and modifications, and post-award supervision and administration. STURGIS was a "public official" within the meaning of 18 U.S.C. § 201(a)(1).

4.      PERSON A was STURGIS's relative. PERSON A formed COMPANY A in the Commonwealth of Pennsylvania on or about December 10, 2014. PERSON A and COMPANY A purportedly provided security and consulting services to SOTOMAYOR and EMG.

5.      PERSON B was the owner, president, and sole director of COMPANY B, a government contractor located in the Eastern District of Virginia. In or about June 2013, PERSON B retained SOTOMAYOR and EMG to provide strategic consulting and project management services for COMPANY B. On or about January 20, 2014, PERSON B transferred COMPANY B stock to SOTOMAYOR and made him a minority owner of COMPANY B. PERSON B introduced SOTOMAYOR to STURGIS in early 2014.

6.      COMPANY B provided staffing, IT solutions, data management, and analytical services to federal agencies, including the BBG. COMPANY B received several contracts,

2

agreements, and task / purchase orders from the BBG that were awarded, supervised, and administered by STURGIS, including a blanket purchase agreement for professional and administrative staffing supplies and services that STURGIS awarded in or about late 2013.

7.      Beginning in or about mid to late 2014, the USAF, SOTOMAYOR, PERSON B, and COMPANY B sought to use COMPANY B's blanket purchase agreement with the BBG as a contracting vehicle to provide supplies and services to HAF/A2's Innovation Initiatives, which included "ACID," "DEWEY," "Smart Node Pod," and various "Special Projects."

8.      On or about September 25, 2014, STURGIS and the BBG used COMPANY B's blanket purchase agreement to issue a purchase order for supplies or services (Contract No. BBG50-A-14-0040/0100 (later renumbered as BBG50-A-14-A-0040/0100)) and execute a series of military interdepartmental purchase request ("MIPR") agreements with the USAF (collectively, the "BBG/USAF contract"). The purchase order, modifications, and MIPRs were used by the USAF to procure over $30 million in services and supplies from COMPANY B between in or about September 2014 and in or about September 2017. Among other things, STURGIS served as the assigned contracting officer for the blanket purchase agreement, purchase order, modifications, statements of work, performance work statements, MIPRs, invoice processing / approvals, and vendor security approval processes.

9.      SOTOMAYOR, EMG, and FSA provided consulting and subcontractor services to COMPANY B, including services related to the BBG/USAF contract for which SOTOMAYOR received millions of dollars. Among other things, SOTOMAYOR served as a liaison between the USAF, COMPANY B and PERSON B, and the BBG and STURGIS, and he communicated frequently with STURGIS while he was within the Eastern District of Virginia.

3

## COUNT 1
### (Conspiracy)

10.     The allegations set forth in paragraphs 1–9 are realleged and incorporated by reference as though fully set forth herein.

11.     Beginning in or about mid to late 2014, and continuing until at least in or about October 2017, in the Eastern District of Virginia and elsewhere, the defendant, JULIO R. SOTOMAYOR (a/k/a "JACE SOTOMAYOR," "J.R. SOTOMAYOR," and "WIZARD"), STURGIS, PERSON A, and others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other:

   a.     To engage in bribery, that is, to directly and indirectly, knowingly and corruptly give, offer, and promise anything of value to any public official, and offer and promise any public official to give anything of value to any other person and entity, with intent to influence any official act, in violation of 18 U.S.C. § 201(b)(1); and

   b.     To devise and intend to devise a scheme and artifice to defraud and deprive the BBG and the citizens of the United States of their intangible right to the honest services of STURGIS, a BBG contract specialist and contracting officer, through bribery and kickbacks, and to transmit and caused to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. §§ 1343 and 1346.

### Purpose of the Conspiracy

12.     The purpose of the conspiracy was: (a) to use STURGIS's position as a BBG contract specialist and contracting officer to benefit and enrich SOTOMAYOR, PERSON B, COMPANY B, STURGIS, and PERSON A through bribery and kickbacks; (b) to defraud the

4

BBG and the citizens of the United States and deprive them of their intangible right to the honest services of STURGIS, a BBG contracting specialist and contracting officer, through bribery and kickbacks; and (c) to conceal the nature and purpose of the scheme and artifice to defraud.

### Manner and Means of the Conspiracy

The conspiracy was carried out through the following manner and means, among others:

13.     SOTOMAYOR and STURGIS agreed to engage in a corrupt scheme in which SOTOMAYOR, through EMG, paid approximately $150,000 to STURGIS using her relative, PERSON A, as a pass-through intermediary. In exchange for these payments, STURGIS agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—benefitting SOTOMAYOR, COMPANY B, and PERSON B regarding the awarding, modifying, administering, and supervising of the BBG/USAF contract. Also in exchange for these payments, STURGIS was placed on retainer and performed official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for SOTOMAYOR, COMPANY B, and PERSON B, as opportunities arose. STURGIS, among other things, approved and awarded the BBG/USAF contract to COMPANY B, including multiple modifications; she recommended approvals of statements of work; she certified packages that provided security requirements and classification guidance to contractors; she assisted in obtaining the BBG's authorization and approval of MIPR agreements; she assisted with the invoice and payment approval process; she evaluated COMPANY B's performance, and she assisted with other business opportunities for SOTOMAYOR, COMPANY B, and PERSON B.

5

14.     At or near the time when SOTOMAYOR, PERSON B, and COMPANY B were seeking to use COMPANY B's blanket purchase agreement with the BBG as a vehicle for the BBG/USAF contract, SOTOMAYOR discussed giving money to STURGIS by using a pass-through mechanism to disguise the payments to STURGIS.  SOTOMAYOR and STURGIS discussed providing money to STURGIS by hiring her relative, PERSON A, and paying the money to PERSON A.  SOTOMAYOR and STURGIS also discussed PERSON A's background and work experience; having PERSON A form or use a business that appeared to be security-related to facilitate the pass-through payments to STURGIS; creating a business account to receive the payments from SOTOMAYOR; and taking additional steps to conceal the transfers to STURGIS.

15.     STURGIS drafted a fabricated resume for PERSON A and, on or about November 10, 2014, sent an e-mail to SOTOMAYOR with the fabricated resume attached.  The resume listed false professional and educational qualifications and experiences for PERSON A.

16.     PERSON A, in or about December 2014, formed COMPANY A and created a business bank account for COMPANY A.

17.     Between in or about December 2014 and in or about October 2017, SOTOMAYOR contacted STURGIS regarding the scheme from within the Eastern District of Virginia and elsewhere, and he periodically met with STURGIS in the Eastern District of Virginia and elsewhere regarding the scheme.  During certain meetings, SOTOMAYOR gave STURGIS envelopes containing checks issued by SOTOMAYOR and EMG for COMPANY A. SOTOMAYOR, at least occasionally, also provided STURGIS with fabricated invoices from COMPANY A to EMG, purportedly for consulting work performed by COMPANY A.

6

18.     PERSON A and COMPANY A did not provide consulting work for EMG, and
PERSON A never met with SOTOMAYOR or communicated with him.

19.     After receiving the envelopes from SOTOMAYOR, STURGIS provided the EMG
checks to PERSON A.  PERSON A deposited the checks into PERSON A's newly created
business account for COMPANY A.  PERSON A then transferred most of the EMG money from
the business account to a personal account.  PERSON A, in general, withdrew the money from
the personal account (and the remaining funds in the business account) as cash, wrote checks to
STURGIS when she needed the money, and used the funds to pay joint expenses for STURGIS
and PERSON A.  STURGIS typically deposited the money received from PERSON A into one
of STURGIS's personal bank accounts.  SOTOMAYOR and EMG thereafter issued IRS Forms
1099-Misc to COMPANY A to make the purported consulting work appear legitimate.

### Overt Acts

In furtherance of the conspiracy and to effect its objects, SOTOMAYOR, STURGIS,
PERSON A, and others committed the following overt acts, among others, in the Eastern District
of Virginia and elsewhere:

20.     Between in or about mid to late 2014 and in or about November 2014,
SOTOMAYOR and STURGIS discussed and agreed that SOTOMAYOR would make payments
to STURGIS using PERSON A as a pass-through intermediary.

21.     On or about September 12, 2014, after PERSON B and STURGIS discussed a
Department of Defense ("DOD") project (on or about September 10, 2014), STURGIS sent a
follow-up e-mail to PERSON B asking whether PERSON B wanted to discuss a contract vehicle
for COMPANY B's military projects.  PERSON B replied, "Answer is yes yes yes.  Have this

tech innovation project DOD wants us to take on. They are looking for a great CO. Thought of you. Can you help?" STURGIS replied, "Yes."

22.     On or about September 19, 2014, PERSON B sent an e-mail to STURGIS about the BBG/USAF contract stating in part, "Remember [SOTOMAYOR]. He is helping us with this. He asked for your contact info. I am going to send him your email address and phone number. He is talking with the users and is at the Pentagon today."

23.     On or about September 25, 2014, after STURGIS had extensive communications with SOTOMAYOR, PERSON B, and BBG and USAF officials, STURGIS signed a purchase order for supplies and services to COMPANY B totaling approximately $11,000,000 that was issued pursuant to COMPANY B's blanket purchase agreement.

24.     On or about November 10, 2014, after STURGIS created a fabricated resume for PERSON A, STURGIS sent an e-mail to SOTOMAYOR attaching the fabricated resume and stating, "Hi [SOTOMAYOR], Attached is [PERSON A's] resume, also do you want to schedule to meet this week." SOTOMAYOR replied, "Let's catch latter part."

25.     On or about December 9, 2014, SOTOMAYOR sent an e-mail to STURGIS scheduling a meeting with STURGIS and USAF officials at the Pentagon on or about December 16, 2014. STURGIS also invited STURGIS to attend a holiday gathering on the same day at a bar / restaurant in Arlington, Virginia within the Eastern District of Virginia.

26.     On or about December 10, 2014, PERSON A incorporated COMPANY A in Pennsylvania.

27. On or about December 15, 2014, SOTOMAYOR issued a $30,000 check (#1802) from EMG to COMPANY A with the memo line "Prof Cnsltg. – Invoice Dec." SOTOMAYOR and PERSON B also called STURGIS on the same day.

28. On or about December 16, 2014, STURGIS met with SOTOMAYOR in the Eastern District of Virginia and attended the meetings at the Pentagon. On the same day, PERSON B sent an e-mail to STURGIS stating in part, "Heard you had some good meetings at the Pentagon and you were absolutely fantastic. Got lots of great feedback."

29. On or about December 17, 2014, PERSON A opened a business checking account for COMPANY A and, after receiving SOTOMAYOR / EMG's $30,000 check from STURGIS, deposited the check into COMPANY A's business account.

30. On or about December 17, 2014, COMPANY B submitted its initial invoices to STURGIS for the BBG/USAF contract.

31. In or about January 2015, after COMPANY B and PERSON B complained to STURGIS that COMPANY B was having difficulty getting paid on its initial invoices, STURGIS took steps to fix the problem with DOD's Defense Financial Accounting System ("DFAS").

32. On or about January 13, 2015, STURGIS sent an e-mail to SOTOMAYOR, PERSON B, and others at USAF attaching a signed memorandum delegating authority to a USAF official to serve as the contracting officer technical representative ("COTR"). The COTR, STURGIS, SOTOMAYOR, and PERSON B communicated frequently thereafter regarding contract performance issues for the BBG/USAF contract.

9

33.     In or about February 2015, after SOTOMAYOR and PERSON B urged
STURGIS to do so, STURGIS agreed to serve as the approver (signer / validator) of COMPANY
B's invoices in DOD's Wide Area Workflow ("WAWF") electronic payment system.

34.     On or about February 18, 2015, STURGIS signed a contract modification that,
among other things, incorporated WAWF clauses that allowed STURGIS to approve
COMPANY B's invoices in WAWF.  STURGIS submitted her request for access to WAWF on
or about March 4, 2015.

35.     On or about February 27, 2015, PERSON B sent an e-mail to STURGIS
proposing language for STURGIS to include in an e-mail to USAF officials who were expressing
concerns about STURGIS's involvement in the WAWF system.  STURGIS cut and pasted
PERSON B's draft response into a reply e-mail and sent the e-mail to USAF officials.

36.     On or about April 1, 2015, SOTOMAYOR issued a $30,000 check (#1842) from
EMG to COMPANY A with the memo line "Prof Cons – [UI]."  SOTOMAYOR also provided
STURGIS with a fabricated invoice, dated March 31, 2015, purportedly from COMPANY A to
EMG, for security and consulting services.

37.     On or about April 2, 2015, after PERSON A received SOTOMAYOR / EMG's
$30,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business
account.

38.     On or about April 8, 2015, after SOTOMAYOR called STURGIS and sent her e-
mails agreeing to meet and escort her, SOTOMAYOR and STURGIS met with USAF officials at
the Pentagon.  STURGIS also signed a DD Form 254, certifying the security requirements,

classification guidance, and handling procedures for classified material made available to COMPANY B's contractors and subcontractors as part of the BBG/USAF contract.

39.     Between in or about May 2015 and in or about September 2015, SOTOMAYOR and STURGIS communicated frequently to discuss, among other things, potential new matters, having STURGIS approve an invoice in WAWF for COMPANY B, having STURGIS exercise the next option year on the BBG/USAF, processing a new MIPR, funding for the fiscal year, and, upon SOTOMAYOR's urging, having STURGIS assist with publishing a BBG request for information for a new solicitation involving the Air National Guard.

40.     On or about August 11, 2015, SOTOMAYOR sent an e-mail to STURGIS asking her to sign and recommend approval of a statement of work for the DEWEY project, which related to exercising the first option year on the BBG/USAF contract. STURGIS complied with SOTOMAYOR's request and signed the statement of work on or about August 14, 2015.

41.     On or about September 17, 2015, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M003) signed by STURGIS. The contract modification exercised the first option year on the BBG/USAF contract with COMPANY B and clarified that the BBG/USAF contract included four option years.

42.     On or about September 30, 2015, after STURGIS assisted SOTOMAYOR in getting the BBG's approval of MIPR agreements, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M004) signed by STURGIS. The contract modification added approximately $475,650 to the BBG/USAF contract, among other changes.

43.     In or about October 2015, STURGIS approved COMPANY B's pending invoice in WAWF for approximately $1,738,419.03.

11

44.     On or about February 8, 2016, SOTOMAYOR sent an e-mail to STURGIS asking for the BBG's approval of a MIPR package (totaling approximately $200,000).

45.     On or about February 12, 2016, SOTOMAYOR sent an e-mail to STURGIS asking her to sign draft statements of work to modify and extend a portion of COMPANY B's contract regarding the ACID and DEWEY Projects.  STURGIS complied with SOTOMAYOR's request, signing both statements of work and recommending their approval on or about February 16, 2016.

46.     On or about February 24, 2016, after STURGIS obtained the necessary approvals within the BBG, STURGIS sent an e-mail to SOTOMAYOR attaching the signed MIPR.

47.     On or about February 25, 2016, STURGIS signed a contract modification (M005) adding approximately $200,000 to the BBG/USAF contract, among other changes.

48.     On or about March 5, 2016, SOTOMAYOR issued a $30,000 check (#2051) from EMG to COMPANY A with the memo line "Prof Conslt Spt Inv 16-1."  SOTOMAYOR also provided STURGIS with a fabricated invoice, dated March 1, 2016, purportedly from COMPANY A to EMG, for security and consulting services.

49.     On or about March 8, 2016, SOTOMAYOR sent an e-mail to STURGIS, confirming their lunch meeting.

50.     On or about March 10, 2016, after STURGIS provided SOTOMAYOR / EMG's $30,000 check to PERSON A, PERSON A deposited the check into COMPANY A's business account.

51.     On or about April 27, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M007) signed by STURGIS.  The contract

12

modification added approximately $7,156,952.88 to the BBG/USAF contract, among other changes.

52.     On or about April 28, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M006) signed by STURGIS on or about April 16, 2016. The contract modification added approximately $1,350,000 to the BBG/USAF contract, among other changes.

53.     On or about June 21, 2016, SOTOMAYOR issued a $30,000 check (#2095) from EMG to COMPANY A with the memo "Inv 2016-01 EMG."

54.     On or about June 27, 2016, after PERSON A received SOTOMAYOR / EMG's $30,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

55.     On or about September 8, 2016, STURGIS sent an e-mail to PERSON B attaching a contract modification (M008) signed by STURGIS. The contract modification added approximately $197,000 to the BBG/USAF contract, among other changes.

56.     On or about September 29, 2016, STURGIS signed a contract modification (M009). The contract modification added approximately $250,000 to the BBG/USAF contract, among other changes.

57.     On or about November 14, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M010) signed by STURGIS. The contract modification added approximately $177,795 to the BBG/USAF contract, among other changes.

13

58.     On or about December 7, 2016, STURGIS completed a Contractor Performance Assessment Reporting System ("CPARS") evaluation for COMPANY B and PERSON B upon PERSON B's request.

59.     On or about December 23, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M011) signed by STURGIS.  The contract modification added approximately $45,337.39 to the BBG/USAF contract, among other changes.

60.     On or about December 29, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M012) signed by STURGIS.  The contract modification added approximately $650,000 to the BBG/USAF contract, among other changes.

61.     On or about January 23, 2017, STURGIS signed CPARS evaluations for COMPANY B and PERSON B.

62.     On or about March 16, 2017, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M013) signed by STURGIS.  The contract modification added approximately $1,102,089 to the BBG/USAF contract, among other changes.

63.     On or about April 5, 2017, SOTOMAYOR met with STURGIS and provided her with notes and paperwork relating to a modification and MIPR that would add approximately $551,000 to the BBG/USAF contract.

64.     On or about April 10, 2017, SOTOMAYOR issued a $15,000 check (#2186) from EMG to COMPANY A with the memo "Prof Svcs Inv 2017-01."

65.     On or about April 13, 2017, after STURGIS assisted in obtaining the BBG's approval of a MIPR agreement, STURGIS sent an e-mail to SOTOMAYOR and PERSON B,

attaching a contract modification (M014) signed by STURGIS. The modification added approximately $551,000 to the BBG/USAF contract, among other changes.

66.    On or about May 1, 2017, after PERSON A received SOTOMAYOR / EMG's $15,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

67.    On or about June 1, 2017, STURGIS signed two contract modifications (M015 and M016), adding approximately $2,100,000 and $30,000, respectively, to the BBG/USAF contract among other changes.

68.    On or about June 19, 2017, STURGIS signed and certified a DD Form 254 contract security classification specification for the BBG/USAF contract.

69.    On or about June 21, 2017, STURGIS signed a contract modification (M017), adding approximately $400,000 to the BBG/USAF contract, among other changes.

70.    On or about June 26, 2017, STURGIS signed and recommended approval of statements of work to modify and extend the BBG/USAF contract as to the DEWEY and ACID projects.

71.    On or about July 25, 2017, STURGIS signed a contract modification (M018), adding approximately $4,175,334.72 to the BBG/USAF contract, among other changes.

72.    On or about August 9, 2017, STURGIS signed a contract modification (M019), adding approximately $1,993,243.29 to the BBG/USAF contract, among other changes.

73.    On or about September 18, 2017, STURGIS signed a contract modification (M020) exercising the two remaining option years on the BBG/USAF contract, which extended the performance period for COMPANY B through in or about September 24, 2019.

74.     On or about October 4, 2017, SOTOMAYOR issued a $15,000 check (#2248) to COMPANY A with the memo "Cnst Spt Inv – 17-03."

75.     On or about October 13, 2017, after PERSON A received SOTOMAYOR / EMG's $15,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

76.     Between in or about December 2014 (when PERSON A opened the business account for COMPANY A) and in or about early October 2020 (when PERSON A closed the business account for COMPANY A), PERSON A transferred most of the $150,000 from SOTOMAYOR and EMG to PERSON A's personal account and, in general, forwarded the money to STURGIS by check, withdrew it as cash, and used it to pay STURGIS's joint expenses.   PERSON A did likewise with funds remaining in the business account.

77.     Between in or about 2014 and in or about 2017, SOTOMAYOR and EMG issued IRS Forms 1099-Misc to COMPANY A for the payments from EMG to COMPANY A.

(In violation of 18 U.S.C. § 371.)

16

## COUNT 2
### (Bribery)

78.     The allegations set forth in paragraphs 1–9 and 13–77 are realleged and incorporated by reference as though fully set forth herein.

79.     Beginning in or about mid to late 2014, and continuing until at least in or about October 2017, in the Eastern District of Virginia and elsewhere, the defendant, JULIO R. SOTOMAYOR (a/k/a "JACE SOTOMAYOR," "J.R. SOTOMAYOR," and "WIZARD"), directly and indirectly, knowingly and corruptly did give, offer, and promise and agree to give, offer, and promise, anything of value (specifically, a stream of payments) to STURGIS, a public official, and offered and promised STURGIS to give anything of value to any other person and entity, including PERSON A, with intent to influence STURGIS in the performance of official acts (specifically, a series of official acts on as-needed basis relating to the BBG/USAF contract involving SOTOMAYOR, PERSON B, and COMPANY B).

(In violation of 18 U.S.C. §§ 201(b)(1) and 2.)

## COUNTS 3-6
### (Honest Services Wire Fraud)

80.     The allegations set forth in paragraphs 1–9, 13–77 are realleged and incorporated by reference as though fully set forth herein.

81.     Beginning in or about mid to late 2014, and continuing until at least in or about October 2017, in the Eastern District of Virginia and elsewhere, the defendant, JULIO R. SOTOMAYOR (a/k/a "JACE SOTOMAYOR," "J.R. SOTOMAYOR," and "WIZARD"), along with STURGIS, PERSON A, and others known and unknown to the grand jury, knowingly devised and intended to devise a scheme and artifice to defraud the BBG and the citizens of the United States by depriving them of their intangible right to the honest services of STURGIS, through bribery and kickbacks.

### Scheme and Artifice to Defraud

82.     The scheme and artifice to defraud, including the concealment of material information, is described in paragraphs 1–9 and 13–77 of this Indictment.

### Execution of the Scheme and Artifice to Defraud

83.     On or about the dates shown in the table below, in the Eastern District of Virginia and elsewhere, SOTOMAYOR, STURGIS, PERSON A, and others known and unknown to the grand jury, for the purpose of executing the foregoing scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, the writings, signs, signals, pictures, and sounds described below, each such wire transmission constituting a separate count:

18

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 3 | 04/10/2017 (posted 05/01/2017) | EMG check # 2186 (issued by SOTOMAYOR and made payable to COMPANY A in the amount of $15,000), which was negotiated and deposited outside the Commonwealth of Virginia, and which caused COMPANY A's bank to transmit information through interstate wire communication from outside the Commonwealth of Virginia to the Eastern District of Virginia. |
| 4 | 10/04/2017 (posted 10/13/2017) | EMG check # 2248 (issued by SOTOMAYOR and made payable to COMPANY A in the amount of $15,000), which was negotiated and deposited outside the Commonwealth of Virginia, and which caused COMPANY A's bank to transmit information through interstate wire communication from outside the Commonwealth of Virginia to the Eastern District of Virginia. |
| 5 | 04/17/2017 | COMPANY B invoice in the amount of $1,134,557.21 submitted to USAF in the Eastern District of Virginia, which was received, reviewed, and approved and which caused the transmission of information contained in the invoice through interstate wire communication from within the Eastern District of Virginia to DFAS outside the Commonwealth of Virginia so that the United States would pay COMPANY B for the amount stated in the invoice. |
| 6 | 06/12/2017 | COMPANY B invoice in the amount of $379,755.09 submitted to USAF in the Eastern District of Virginia, which was received, reviewed, and approved and which caused the transmission of information contained in the invoice through interstate wire communication from within the Eastern District of Virginia to DFAS outside the Commonwealth of Virginia so that the United States would pay COMPANY B for the amount stated in the invoice. |

(In violation of 18 U.S.C. §§ 1343, 1346, and 2.)

## FORFEITURE NOTICE

THE GRAND JURY FINDS PROBABLE CAUSE FOR FORFEITURE AS SET FORTH
BELOW:

84.    Pursuant to Rule 32.2(a), the defendant, JULIO R. SOTOMAYOR (a/k/a "JACE

SOTOMAYOR," "J.R. SOTOMAYOR," and "WIZARD"), is hereby notified that, if convicted

of the bribery offense alleged in Count 2 of this Indictment, any of the honest services wire fraud

offenses alleged in Counts 3-6 of this Indictment, or a conspiracy to commit bribery or honest

services wire fraud, as set forth in Count 1 of this Indictment, he shall forfeit to the United States

of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or

personal, which constitutes or is derived from proceeds traceable to the offense(s).  The property

to be forfeited includes, but is not limited to, a money judgment order of no less than $5,000,000.

85.    If any of the property directly traceable to the offense(s), as a result of any act or

omission of the defendant:

       a.    cannot be located upon the exercise of due diligence;

       b.    has been transferred or sold to, or deposited with, a third party;

       c.    has been placed beyond the jurisdiction of the court;

       d.    has been substantially diminished in value; or

       e.    has been commingled with other property which cannot be divided

           without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21

U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

(In accordance with 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); and Rule 32.2(a), Federal

Rules of Criminal Procedure.)

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

Foreperson

Jessica D. Aber
United States Attorney

Corey R. Amundson
Chief, Public Integrity Section

By: _Edward P. Sullivan_____
Edward P. Sullivan
Special Assistant United States Attorney (LT)
Senior Litigation Counsel, Public Integrity Section
Heidi B. Gesch
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3700
Edward.P.Sullivan@usdoj.gov
Heidi.Gesch@usdoj.gov