IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:22-CR-00122 (RDA) |
| | ) | |
| JULIO R. SOTOMAYOR | ) | |
| (a/k/a "JACE SOTOMAYOR"; "J.R. | ) | |
| SOTOMAYOR"; "WIZARD"), | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL**

The United States respectfully submits this opposition to defendant Julio R. Sotomayor's motion to compel.  ECF No. 20.  The defendant's motion seeks to gin up a discovery dispute where there is none.  The defendant primarily seeks the early production of grand jury transcripts, speculating that the government must be withholding testimony from key witnesses or law enforcement agents regarding the allegations in the indictment.  His assumption is wrong. The defendant has already received the grand jury transcripts in this case.  Indeed, even though it was under no obligation to do so, the government has already provided the defendant with an exceptionally early production of *Jencks* material, including the grand jury transcripts and interview reports.  The primary request in his motion to compel is therefore moot.

The defendant is also using his purported discovery dispute over grand jury transcripts (again, a fictional dispute) as a basis for requesting a letter from the government identifying all information in its productions that is discoverable pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  The government, however, has gone well beyond its disclosure obligations to facilitate meaningful review for the defendant, including the following steps:

- The bulk of the discovery in this case was produced well in advance of the current trial date to allow adequate review.

- The discovery productions included load-ready native, text, and image data files with corresponding, easy-to-use indices that are searchable.

- The produced documents included unique identifiers (*i.e.*, Bates numbers) with prefixes identifying the source of the material.

- The discovery productions included all grand jury transcripts, witness interview reports, key exhibits (including the e-mails and documents referenced in the indictment), search warrant packages (including probable cause affidavits summarizing the allegations), agent notes, and rough transcripts of most of the recorded interviews. The interview reports, grand jury transcripts, rough transcripts of recorded interviews, and most of the key documents referenced in the indictment were segregated and produced as compilation exhibits attached to the grand jury transcripts.

- The government has helped trouble-shoot technical issues raised by the defendant; it has conferred with defense counsel about the scope of discovery (and explained why certain documents were produced relating to Sturgis's corrupt scheme with a different vendor).

- In addition to producing the documents responsive to search warrant applications, the government has made full forensic images of seized materials available for inspection.

The government, throughout this case, has taken significant steps to ensure the defendant promptly received discovery to allow him to prepare for trial. The government produced the discovery in this case in a manner that is searchable and accessible to the defendant the same way it is searchable and accessible to the government. Indeed, defense counsel immediately loaded the discovery into a searchable, electronic discovery platform and, as counsel's letters make clear, has had no difficulty locating key information such as grand jury transcripts, interview reports, and key e-mails referenced in the indictment.

Despite the government's efforts to go well-beyond its discovery obligations, the defendant nonetheless seeks an order compelling the government to comb through the same discovery database that he already possesses (and has thoroughly reviewed) to search for and identify exculpatory *Brady* material. ECF No. 20 at 1, 17. The defendant concedes that the

government is under no legal obligation to do so (*id.* at 13), yet he asks the Court to force the government take on a burden that has been clearly repudiated by this Circuit and others.

Federal appellate courts have consistently held that the government is not required to identify *Brady* material in already-disclosed evidence.  Although not cited by the defendant, such a requirement was squarely rejected by the U.S. Court of Appeals for the Fourth Circuit in *United States v. Yi*, 791 F. App'x 437, 438-39 (4th Cir. 2020), *cert. denied*, 140 S. Ct. 2542 (2020) (rejecting defendant's claim that the government violated *Brady* by not identifying exculpatory information in a voluminous discovery production).  Among other requirements, the touchstone of a *Brady* analysis is whether the government has "suppressed" exculpatory material.  *United States v. King*, 628 F.3d 693, 701 (4th Cir. 2011).  "Evidence cannot be regarded as 'suppressed' by the government when the defendant has access to the evidence before trial[.]" *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992).  Moreover, even in cases with voluminous discovery, when the government produces well-organized, searchable discovery, it is not "obliged to sift fastidiously" through it or "direct a defendant to exculpatory evidence" within it.  *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (quoting *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) and *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), *vacated in part on other grounds*, 561 U.S. 358 (2010)).  The government, in sum, is not obligated to search the already-disclosed database for potentially exculpatory material pursuant to *Brady*, or any other legal principle, particularly when it is has taken numerous steps to make the discovery accessible and manageable.  The defendant's motion should be denied.

I.      **Background**

A.      **The Bribery and Fraud Scheme**

A federal grand jury in the Eastern District of Virginia returned a six-count indictment on July 6, 2022, charging the defendant with engaging in a bribery and fraud scheme with Diane Sturgis, a former contracting officer for the Broadcasting Board of Governors ("BBG") (now known as the U.S. Agency for Global Media).[1]  ECF No. 1.  Count 1 of the indictment charges the defendant with conspiracy to commit bribery and honest services fraud, in violation of 18 U.S.C. § 371; Count 2 charges the defendant with bribery, in violation of 18 U.S.C. § 201(b); and Counts 3-6 charge the defendant with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2.  Trial is scheduled for January 23, 2023.  ECF No. 11.

According to the indictment, the defendant is a retired colonel of the U.S. Air Force ("USAF") and the owner of two consulting firms, Eagle Market Group ("EMG") and Federal Security Agency ("FSA").  Sotomayor is also the minority owner of a government contracting firm in Virginia, Company B, that provides staffing, IT solutions, and data and analytical services to agencies, including BBG and USAF.  In addition to serving as Company B's minority owner, Sotomayor, provided consulting and subcontractor services to Company B through his companies, EMG and FSA.  *Id.* ¶¶ 1, 5-9.

Company B received several contracts and purchase orders from BBG that were awarded and supervised by Sturgis, including a blanket purchase agreement.  Beginning in 2014, Sotomayor and Company B's majority owner (Person B) sought to use the blanket purchase

---

[1]      Sturgis has already pleaded guilty to two counts of conspiracy to commit bribery and honest services fraud, including a related scheme involving Company B and Person B.  *See United States v. Diane D. Sturgis*, No. 1:20-cr-00158 (LO) and *United States v. Diane D. Sturgis*, Case No. 1:21-cr-00282 (LO).

agreement as a contracting vehicle to provide supplies and services to USAF to support technology projects and innovative initiatives.  Using military interdepartmental purchase agreements and Company B's blanket purchase agreement with BBG, Sturgis awarded purchase orders and contract modifications to the firm that were worth tens of millions of dollars. Sotomayor, in turn, received millions of dollars while serving as the firm's liaison with USAF and BBG and Sturgis.  ECF No. 1 ¶¶ 6-9.

Sotomayor and Sturgis agreed to engage in a corrupt, multi-year scheme in which Sotomayor, through EMG, paid $150,000 to Sturgis using her relative (Person A) as a pass-through intermediary.  The defendant paid the bribes to Sturgis by making bogus consulting payments to a newly created business formed by Person A.  In exchange for the bribe payments, Sturgis, among other things, agreed to perform, and did perform official acts for Sotomayor, Company B, and Person B.  *Id.* ¶¶ 13-19.

### B.        The Government's Post-Indictment Discovery Productions

The defendant's recitation of the facts in support of his motion to compel is inaccurate in several respects.  The government provides the following information to correct the record.

**First**, the government has not delayed in producing discovery to the defendant.  The defendant received most of the discovery shortly after the defendant's arraignment.  In total, the defendant has received five productions of discovery, with each production including a detailed, easy-to-navigate index in Excel format.  Because the indices are in Excel format, they are searchable and expandable to reveal all metadata information, such as file paths and creation, modification, and sent dates.  The indices are also contractable to reveal header information and general descriptions if the user wants to do basic or quick searches.  At this point, the defendant

has received nearly all the discovery in the case.  The government, of course, will supplement its discovery productions as part of its ongoing obligations.

**Second**, the government's approach to discovery has been one of inclusion and disclosure, not suppression or withholding.  The productions have included all the interview reports for the case (including a voluntary production of agent notes), all the grand jury transcripts, all the materials seized pursuant to search warrants, all the grand jury subpoena material, all the interview recordings, rough transcripts for most, if not all, of the recorded interviews, nearly all the agents' case file material, and an exceptionally early production of most of the *Jencks* material.  Contrary to the defendant's suggestion (ECF No. 20 at 7-8 & Exhibit I at 3), the productions have not been disorganized "data dumps"; instead, in addition to the easy-to-use indices, the government has assigned sequential bates numbers with different prefixes to identify the source of the material (*e.g.*, BBG, FBI, 1A (for FBI subpoena material and bank records), DOJ, DOS (for Department of State, Office of Inspector General), and DOC (additional, pre-processed DOS material)).

**Third**, defense counsel has repeatedly described the discovery as "voluminous," but glosses over the fact that most of the discovery relates to a different case involving Sturgis, and it includes duplicate copies of some of the larger subpoena returns.  *See*, *e.g.*, ECF No. 20 at 2, 7, 9, 11, 17 & Exhibits C, I.  The government informed defense counsel at the beginning of this case that the investigation was initiated based on allegations of fraud and corruption involving Sturgis's oversight of another, unrelated vendor called Star-Hawk Solutions, LLC.  While investigating Sturgis's role with the principals of Star-Hawk, the government learned that Sturgis had a similar fraudulent and corrupt relationship with Sotomayor, Person B, and Company B. The investigative files and subpoena return materials therefore include discovery concerning

6

both vendors since the cases are intertwined and Sturgis's role with Star-Hawk includes *Giglio* and related impeachment material.  The government estimates that more than half of the documents produced relate to this other investigation.  The discovery relating specifically to the allegations in the indictment is relatively discreet and easily manageable, as the government has already informed defense counsel.  ECF No 20, Exhibit K at 2.

**Fourth**, defense counsel also suggests that the government has had a multi-year "head start," claiming the government has been investigating allegations since 2015.  ECF No 20 at 17. This assertion is factually incorrect.  The government's criminal investigation of Sturgis and Star-Hawk began in 2018.  The criminal allegations relating to Sturgis's involvement with Company B and Person B did not surface until mid-2018.  Importantly, allegations regarding the bribery and fraud scheme charged in the indictment did not arise until late 2020.

Specifically, in August 2020, agents approached Sotomayor and interviewed him about his relationship with Company B, Person B, and Diane Sturgis and BBG.  At this time, the government was not aware that Sotomayor was making payments to Sturgis through her relative. When agents approached Sotomayor, they also served him with grand jury subpoenas relating to his consulting companies, EMG and FSA.  Sotomayor retained counsel and did not produce any documents in response to the subpoenas, citing act of production immunity based on the claim that EMG and FSA are sole proprietorships.

In November 2020, Sturgis informed the government during an interview that she had received substantial payments from the defendant.  The government investigated and corroborated this information.  In March 2022, the government contacted the defendant's counsel and executed a three-month tolling agreement.  During the tolling period, the government discussed the bribery and fraud scheme alleged in the indictment and expressed a willingness to

meet with counsel and go through the evidence.  Defense counsel indicated that the defendant was unwilling to resolve his liability through a pre-indictment plea resolution, he did not want to continue negotiations, and he was unwilling to extend the tolling agreement.

Defense counsel also downplays that the government's investigation of the defendant is ongoing, including its investigation of other alleged schemes involving the defendant, Company B, and Person B.  Much of the government's recent discovery productions have consisted of subpoena returns, interview reports and agent notes, and a searchable .pst file (*i.e.*, Microsoft Outlook e-mail involving a DOD employee) relating to these other, uncharged allegations.  The defendant has already received the core documents relating to the charges in the indictment.

**<u>Fifth</u>**, the defendant emphasizes that he is an "individual defendant," presumably to imply that he is receiving basic legal representation in a matter that involves massive amounts of discovery and a "David vs. Goliath" struggle with the Department of Justice.  ECF No. 20 at 18. Although the defendant is not a corporation, he has retained a respected, AmLaw 100 law firm that has nearly 2,000 attorneys, including a deep bench of white-collar criminal practitioners, and yearly revenue of between $2-3 billion.  The defendant also has substantial financial resources, including government contracting income totaling $5-10 million in the last few years alone.

Importantly, the defense's letter-writing campaign (*see* ECF No. 20 at Exhibits C, D, E (referring to defense counsel's "document review software"), H, and I) makes clear that counsel has loaded all the electronic discovery into a searchable and sortable database, much like the database that the government is using.  The defendant's access to the information appears to be the same as the government's access, and defense counsel is having no trouble locating documents in the government's discovery productions, including potential impeachment and exculpatory information.  Indeed, defense counsel has routinely identified documents or

categories of documents by Bates numbers and has even identified a few technical glitches with the government's load-ready data.  *E.g.*, ECF No. 20 at C, D, E, and I; *see also* Exhibit 1.

**Sixth**, defense counsel has complained that Sturgis's government e-mail account contains numerous "spam" or otherwise irrelevant e-mails.  ECF No 20 at 18.  The government has already informed defense counsel that it obtained a portion of Sturgis's government e-mail account covering the relevant period, 2014-17.  Sturgis's government e-mail account includes highly relevant information, including most if not all the e-mails referenced in the indictment.  Through no fault of the government, her account also contains numerous e-mails that are irrelevant, including spam e-mails.  To mitigate this issue, the government, in addition to producing indices for the e-mails, produced Sturgis's e-mail account in a processed, searchable, and sortable format so that defense counsel can distill this e-mail information by date ranges, header information, or other metadata categories.

**Seventh**, defense counsel complains that the defense did not receive a binder of "hot documents" shortly after arraignment.  ECF No. 20 at 17.  However, in addition to grand jury testimony, the defendant received the grand jury exhibits.  The grand jury exhibits include the key documents associated with the allegations in the indictment and, conveniently for the defendant, includes a compilation of the interview reports, core documents and e-mails, the contract award and modification documents, and transcripts grouped together as exhibits.

## II.    **Argument**

### A.    **The Defendant's Request for Grand Jury Transcripts Is Moot Since the Government Has Already Produced the Transcripts**

The defendant's motion raises two issues.  He initially asks the Court to order the government to produce all grand jury transcripts.  The government has already done so, which renders his request moot.

9

The defendant assumes, without basis, that the government marshalled a series of witnesses into the grand jury to testify.  Specifically, he speculates that Diane Sturgis, one of her relatives, and USAF employees or contractors all testified in the grand jury.  They did not. Contrary to the defendant's assertion, the government did not demonstrate an "unwilling[ness] to engage with defense counsel on what testimony remains to be disclosed . . . ."  ECF No. 20 at 15. The government has informed counsel that there are no other witness transcripts.  Exhibit 1 at 1.

**B.**     **The Government Is Not Obligated to Comb Through Discovery Already Produced to the Defendant and Identify Materials that Purportedly Fit His Unspecified Defense Theories**

The defendant's motion also asks the Court to order the government to search discovery material that has already been produced to the defendant and identify items that purportedly fit within his various defense theories.  In support, he implies that the government has pursued its discovery obligations in bad faith.

The Fourth Circuit and numerous other courts have squarely rejected requests to compel the government to search already-produced discovery and specifically identify purportedly exculpatory evidence—particularly where, as here, the government has carried out its discovery obligations in good faith.  The government produced the bulk of the discovery in this case shortly after arraignment, and it completed its core discovery productions (including the time-consuming process of converting the data into load-ready format) over a three to four-month period and well in advance of trial.  It did so in a text searchable and imaged format, with indices identifying the source of the materials, and with a subset of key documents particularly relevant to the indictment to give the defendant even greater visibility into the evidence supporting the charges against him.

10

Whether the defendant has identified records in the discovery that he believes fit his various theories of defense is not indicative of government bad faith.  Just the opposite.  It is evidence that the government's approach to discovery—an approach routinely upheld by courts in this district and throughout the country—in fact does afford the defendant a meaningful ability to efficiently search for and find materials he believes is helpful to his defense.  The government should not be ordered to sift through the discovery and identify documents that the defendant may claim supports his defense theories, particularly when (1) he has had the same access to search the discovery for his evidence as the government has had; and (2) he refused to share his defense theories with the government during pre-indictment negotiations.

### C.   The Fourth Circuit and Other Circuits Make Clear the Government Is Not Obligated to Search for and Specifically Identify Potentially Exculpatory Evidence Within Discovery Already Produced to Defendants

The government has an obligation to disclose exculpatory evidence.  *Brady*, 373 U.S. at 87.  Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution."  *Id*.  To establish a *Brady* violation, a defendant must establish that the prosecutor suppressed evidence that was both material and favorable to the defense.  *King*, 628 F.3d at 701.

However, "[e]vidence cannot be regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence."  *White*, 970 F.2d at 337.  Thus, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim."  *Id.*; *see also United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996) ("The Government will not be found to have suppressed

material information if the information is available to a defendant through the exercise of reasonable diligence.").

In this case, the government's practice has been one of *disclosure*, not suppression. As outlined above, beginning shortly after arraignment, the government produced most of the discovery in a text-searchable format and with accompanying indices and collections of notable documents to aid the defendant in his review. The government also deviated from its standard local practice and voluntarily produced summaries of interviews with potential witnesses many months before trial, it included the agents' notes of those interviews, and it compiled and centralized the interview reports, rough transcripts of recorded interviews, key documents and e-mails, and grand jury transcripts so that they could be located without difficulty.

Given such circumstances, the defendant's request that the government scour the very materials that he already possesses must fail. Every court of appeals to have considered such requests has rejected them, including the Fourth Circuit. *See Yi*, 791 F. App'x at 438-39 (rejecting the argument that the government's *Brady* obligation extends to identifying exculpatory material within its produced discovery). To charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an unreasonable extension of the *Brady* rule. The courts have rightly refused to extend *Brady* in this manner, and have noted that the government is not "obliged to sift fastidiously" through hundreds of thousands or millions of pages (whether paper or electronic). *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010). It is "under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence." *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), *vacated in part*

*on other grounds*, 561 U.S. 358 (2010); *cf. United States v. Joseph*, 996 F.2d 36, 37, 39-41 (3d Cir. 1993); *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011).

Two of the cases cited in *Gray* are perhaps even better illustrations of this widely accepted view. In *Skilling*, the defendant contended that the government's voluminous discovery "resulted in the effective concealment of a huge quantity of exculpatory evidence." 554 F.3d at 576. Skilling argued that the government "suppressed evidence in violation of *Brady*" because it "never directed Skilling to a single *Brady* document contained in the open file." *Id.* In rejecting Skilling's claim, the Fifth Circuit noted that "[a]s a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *Id*. (citing cases).

Particularly relevant here, the Fifth Circuit also held, consistent with the Fourth Circuit's decision in *Yi* and the Seventh Circuit's decisions in *White* and *Parks*, that "where potentially exculpatory information is available to the defendant through an exercise of due diligence, there is no suppression for the purposes of *Brady*." *Id.* The Fifth Circuit highlighted the steps the government took to able the defendant's efficient review of the materials:

> [T]he government did much more than drop several hundred million pages on Skilling's doorstep. The open file was electronic and searchable. The government produced a set of "hot documents" that it thought were important to its case or were potentially relevant to Skilling's defense. The government created indices to these and other documents. The government also provided Skilling with access to various databases concerning prior Enron litigation. Skilling contends that the government should have scoured the open file in search of exculpatory information to provide to him. Yet the government was in no better position to locate any potentially exculpatory evidence than was Skilling.

*Id.* at 577.

Similarly, in *United States v. Warshak*, also cited in *Gray*, the Sixth Circuit rejected a defendant's argument that the government "shrugged off its obligations under *Brady* by simply handing over millions of pages of evidence and forcing the defense to find any exculpatory information contained therein." 631 F.3d at 297. Adopting the Fifth Circuit's reasoning in *Skilling*, the Sixth Circuit held that any argument that the government is "obliged to sift fastidiously through the evidence . . . in an attempt to locate anything favorable to the defense," comes up "empty." *Id*.

Every other court of appeals to have considered such a discovery motion has also rejected it. *See Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) ("Rhoades points to no authority requiring the prosecution to single out a particular segment of a videotape [produced in discovery], and we decline to impose one.") (citing *United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir.1997) ("[T]here is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents with[in] a larger mass of material that it has already turned over.")); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed.").

The same is true of numerous district courts. *See*, *e.g.*, *United States v. Ellis*, No. 2:19-cr-693, 2020 WL 3962288, at *2 (D.N.J. July 13, 2020) (rejecting defendant's argument that government had "affirmative obligation to find exculpatory material" among disclosed discovery, and concluding the government "satisfied its disclosure obligation under *Brady* and has gone further than the requirements of [Rule 16]" by organizing the discovery, providing an

14

index and Bates stamps, providing records in the same format as received from third parties, and "provid[ing], where possible, electronic records in a searchable format"); *United States v. Parks*, No. 18-CR-0251, 2019 WL 4979838, at *3 (N.D. Okla. Oct. 8, 2019) (denying motion to compel government to "identify potentially exculpatory evidence that is included in the discovery materials" because, "defendants have not shown that *Brady* or *Giglio* requires more than the production of potentially exculpatory evidence"); *United States v Omidi*, Case 2:17-cr-00661-DMG (Doc. 1041) (C.D. Cal. Apr. 23, 2021) (denying motion where government followed protocols for electronically stored information; government need not undertake additional measures beyond what it did for its own case preparation to satisfy the defendant's demands); *United States v. Gross*, 424 F. Supp. 3d 800 (C.D. Cal. 2019) (holding that government is under no obligation to identify exculpatory information in voluminous discovery where it has taken reasonable steps to make the discovery accessible to the defendant, such as making the discovery electronic, searchable, and indexed with document control numbers); *United States v. Fenner*, 1:18-cr-00333-RLY-DML, ECF. No. 105 (S.D. Ind. Apr. 9, 2020) (denying defense motion based on *Skilling* in complex, document-intensive fraud case, in part because "[t]he government has already produced extensive discovery, including statements made by Defendants, documents, e-mails, photographs, video footage, the search warrant and affidavit, records recovered during the search, and certain reports from the Indiana State Police and the United States Secret Service"); *United States v. Shelley*, No. CR-16-237-D, 2017 WL 3470940, at *1-2 (W.D. Okla. Aug. 11, 2017) (denying motion to compel government to identify and produce all documents containing *Brady* and *Giglio* information; "this is a complex, document-intensive case with document production expected to number in the millions of pages.  To that end, *Brady* does not require the government to review all documents that have been produced to Defendant for

15

purposes of locating and identifying *Brady/Giglio* material"); *United States v. Weld*, No. CR-08-83 PJH, 2009 WL 901871, at *2 (N.D. Cal. Apr. 1, 2009) ("[D]efendants cannot use *Brady* simply to search for *Brady* materials.  *Brady* is not a pretrial discovery tool.") (citations omitted)).[2]

In sum, the vast weight of authority undercuts the relief the defendant seeks, particularly where, as here, the defendant is represented by retained, highly capable counsel who have been in possession of organized, searchable discovery for a substantial period.

**D.     The Limited Authority Cited by the Defendant Is Distinguishable**

The defendant cites four cases in support of his arguments.  ECF No. 20 at 17 (citing *United States v. Saffarinia*, 424 F. Supp. 3d 46, 85 (D.D.C. 2020); *United States v. Blankenship*, No. 5:14-cr-00244, 2015 WL 3687864, *7-8 (S.D.W. Va. June 12, 2015); *United States v. Salyer*, No. S-10-cr-0061, 2010 WL 3036444, *6 (E.D. Cal. Aug. 10, 2010); *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998).  In a footnote, he also makes a passing reference to *United States v. Contech Engineered Solutions, LLC*, No. 5:20-CR-481-FL-2, 2021 WL

---

[2]      *See also*, *e.g.*, *United States v. Lacey*, No. CR-18-00422-PHX-SMB, 2020 WL 85121 (D. Ariz. Jan. 7, 2020) (denying motion to compel where defendants demanded that the government produce discovery in a specific manner); *United States v. AU Optronics Corp.*, No. 09-cr-0110, 2011 WL 6778520 at *2 (N.D. Cal. 2011) (denying motion to compel government to identify *Brady* material within 37 million pages of documents produced in discovery); *United States v. Ohle*, S3:08-cr-1109, 2011 WL 651849 at *4 (S.D.N.Y. 2011) (reiterating that "as a general rule, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"); *United States v. Rubin/Chambers*, 825 F. Supp. 2d 451, 454 (S.D.N.Y. 2011) ("[T]he Court finds that *Brady* and its progeny impose no obligation on the Government to organize for Defendants in the format they design material already provided to them."); *United States v. Perraud*, No. 09-60129-CR, 2010 WL 228013 (S.D. Fla. Jan. 14, 2010) (denying motion to compel identification of impeachment key material involving voluminous discovery); *United States v. Ferguson*, 478 F. Supp. 2d 220, 241-42 (D. Conn. 2007) (denying motion to identify "*Brady* and *Giglio* materials already produced" because government provided discovery in searchable format and "hot docs" at arraignment).

714991 (E.D.N.C. Feb. 18, 2021), ECF No. 20 at 13 n.7).  The circumstances in each of those cases are distinguishable from those in this case.

In *Blankenship*, *Salyer*, and *Hsia*, the discovery produced to the defense was in a less user-friendly format than here.  For example, the court in *Blankenship* distinguished the Fifth Circuit's decision in *Skilling* on the ground that the government in the prosecution of Skilling took "additional steps" when producing pretrial discovery, including providing the material in electronic and searchable format accompanied by indices.  *Blankenship*, 2015 WL 3687864, at *6; *see also Salyer*, 2010 WL 3036444, at *3 (describing discovery as consisting of multiple gigabytes of electronic information spanning millions of pages and hard copy documents that filled more than two storage containers); *Hsia*, 24 F. Supp. 2d at 28 (noting that the Government had produced a "mass of paper" consisting of approximately 600,000 documents).

Thus, there is at least some reason to doubt that these district courts would have still ordered the government to specifically identify *Brady* material had the government provided pretrial discovery, as it did to the defendant here, in an electronically searchable format.  Indeed, numerous courts have declined to order such relief in comparable circumstances (*i.e.*, when the discovery is electronic and searchable).  *See Skilling*, 554 F.3d at 577 (finding that, by providing documents that were "electronic and searchable," and accompanied by indices and producing a set of "hot documents," the Government "did much more than drop several hundred million pages on [the defendant's] doorstep"); *United States v. Weaver*, 992 F. Supp. 2d 152, 156 (E.D.N.Y. 2014) (declining to follow *Hsia* and *Salyer* where "the government . . . provided detailed indices for all the materials it produced, the majority of which were provided in both PDF and 'load-ready' file format that could be easily searched"); *Rubin/Chambers*, 825 F. Supp.

2d at 456 (distinguishing *Salyer* on the grounds that the Government had produced discovery in "electronic and searchable" format).

Lastly, the defendant's heavy reliance on *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020)—a case that was prosecuted by one of undersigned counsel—is misplaced because Saffarinia's "counsel [was] handling this matter pro bono" with "time constraints," and "limited financial resources." *Id.* at 85. Most importantly, defense counsel claimed in that case that the defense was **_not_** using a searchable electronic discovery database (contrary to the government's understanding), meaning that counsel was purportedly reviewing the documents one-by-one by manually clicking on the native or imaged document. Here, by contrast, the defendant has loaded all the discovery into a searchable electronic discovery platform. Indeed, defense counsel's letters show that the defense is having no difficulty locating documents and is specifically identifying them by type and Bates number. *See*, *e.g.*, ECF No. 20 at Exhibit C at 2; Exhibit D at 2; Exhibit E at 2; Exhibit L at 2. The defendant is represented by talented and well-resourced counsel from a large, respected law firm that is not handling the case *pro bono*. *See* ECF No. 119 at 12 & n.4. Likewise, here, there are no "time constraints" as the defendant has been in possession of most of the discovery for months and has made clear that he has already scoured the discovery in detail.

Finally, the defendant's motion to compel fails to mention *United States v. Meek*, No. 1:19-cr-00378, 2021 WL 1049773, at *5-7 (S.D. Ind. Mar. 19, 2021). In that case, the district court distinguished the same set of cases cited by the defendant here (*i.e.*, *Salyer*, *Blankenship*, *Hsia*, and *Saffarinia*) based on facts nearly identical to those present here. In the *Meek* case, the defendants moved the court to order the government to identify any *Brady* material of which it was aware, citing the same cases the defendant in the instant case cites in its motion to compel.

The court denied the motion, stating that the general rule is that "the Government is not obligated to identify *Brady* material within a mass of discovery." *Id*. at 4. In its decision, the court identified several factors that distinguished the *Meek* case from the cases cited in its motion, including (1) the sophistication of the defendants, (2) the experience and talent of defense counsel from notable law firms, (3) the zealous representation by defense counsel (countering a suggestion that the defendants were operating with very limited resources), and (4) the prompt production of materials by the government in searchable format with indices. *Id.* at 5. All these factors are likewise present here, and thus favor applying the general rule in this case. Finally, the court noted that requiring the government to identify *Brady* material would not only impose an additional burden on the government, but it would also "invite future disputes as to whether the Government did an adequate job of identifying such material or characterized the material consistent with the Defendants' view of it," adding that "Defendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense." *Id.*

Finally, in a footnote, the defendant mentions *United States v. Contech Engineered Sols. LLC*, No. 5:20-CR-481-FL-2, 2021 WL 714991 (E.D.N.C. Feb. 18, 2021). ECF No. 20 at 13 n.7. In that case, the defendant complained about an impermissible "data dump" involving more than 1.6 million pages. The magistrate judge did recognize that "there are no clear measures of when a large document production fails to fulfill the Government's *Brady* obligations to disclose exculpatory material in time for its effective use at trial. *Id.* at *5. According to the court, the "fact-bound" analysis depends on whether the government has facilitated the defendant's review of the production, such as whether the production is searchable and includes indices and key documents. *Id*.

The reason why the defendant does not emphasize *Contech* is because it undermines his position. The court did not order the government in that case to identify *Brady* information in a voluminous discovery production; instead, it exercised its discretion and applied an intermediate approach. Specifically, the magistrate judge ordered the government to simply identify in good faith portions of the discovery that it knew it was *not* going to utilize in its case-in-chief. *Id.* Here, the government does not intend to use the discovery materials relating to Star-Hawk in its case-in-chief. This, alone, eliminates more than half the voluminous "haystack" about which the defendant complains.

**E.        The Government Has Conducted Discovery in Good Faith**

Courts have recognized a narrow exception to the general rule of not requiring the government to search already-produced discovery for *Brady* material in cases where there is evidence that, by producing a voluminous amount of discovery, the government "was acting in bad faith in performing its obligations under *Brady*." *See Skilling*, 554 F.3d at 577; *Warshak*, 631 F.3d at 297. Those courts held open the possibility that a future defendant might be able to demonstrate a violation of *Brady* if, for example, the government "'padded' an open file with pointless or superfluous information to frustrate a defendant's review," *Skilling*, 554 F.3d at 577, "larded its production with entirely irrelevant documents," *Warshak*, 631 F.3d at 297, or hid exculpatory material "in the open file with the hope that [the defendant] would never find it," *Skilling*, 554 F.3d at 577.

There are no such sharp practices here, however, and the defendant has not pointed to any. *See Warshak*, 631 F.3d at 298 (denying motion because defendants offered "no indication that the government deliberately concealed any exculpatory evidence in the information it turned over to the defense"). That is because the government has voluntarily endeavored to ensure the

defendant received discovery early and in a form that allows for efficient search and review, as described above.  Moreover, the government has not resorted to litigation over every issue but rather has compromised where appropriate and efficient.  *See*, *e.g.*, ECF No 20 at Exhibit F and K; *see also* Exhibit 1.  The government also did not attempt to bury a needle in a haystack, contrary to the defendant's assertion.  Instead, it produced the grand jury transcripts, interview reports, key e-mails and documents referenced in the indictment, BBG contract documents, and rough interview transcripts together.  Such conduct is reflective of the government's good faith approach to discovery in this case and belies any suggestion of bad faith.

Although the defendant does not outright allege "bad faith" by the government (let alone offer any evidence of it), he attempts to manufacture the impression of bad faith because the government specifically (and correctly) declined to engage in the exercise that the defendant seeks in his instant motion to compel.  The government has not intentionally withheld *Brady* material from its discovery productions to the defense, and it has simply noted that it is under no obligation to identify all potential *Brady* material in its comprehensive discovery productions.

Finally, the fact that the discovery contains documents that the defendant believes he can use in his defense is also not evidence of bad faith.  That fact is true in practically every criminal case.  Rather, it is evidence that the government's approach to discovery in this case—which, as described above, has been blessed by numerous courts of appeals and district courts—is working as it should.  The defendant can search, and clearly has searched, the text and metadata of the discovery to locate the evidence he believes will be helpful to him.  And, using the indices provided with each production, he can focus his searches on the subset of the discovery he is most interested in.  For example, defense counsel can easily identify e-mail communications between Sturgis and the defendant and/or Person B by conducting a search of Sturgis's e-mails

with the defendant and/or Person B.  The government can hardly be said to have "suppressed" such communications or "padded the file" to make it difficult to find them.

F.     **The Relief Defendant Requests Is Untenable, and It Inappropriately Requires the Government to Conduct the Defense's Investigation for It**

The Fourth Circuit and courts throughout the country have recognized that "*Brady* does not require the Government to investigate the defense's theory of the case or create evidence that might be helpful to the defense." *United States v. Makarita*, 576 F. App'x 252, 262 (4th Cir. 2014); *Gray*, 648 F.3d at 567 (holding the government "no duty" to "conduct the defense's investigation for it"); *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980) ("Truth, justice, and the American way do not, however, require the Government to discover and develop the defendant's entire defense.").

The defendant is undoubtedly in a better position than the government to identify materials that he believes fits his theories of defense—theories into which the government has little insight because defense counsel declined to share information during pre-indictment plea negotiations.  Requiring the government to attempt to identify evidence potentially bearing on any number of defense theories "would place prosecutors in the untenable position of having to prepare both sides of the case at once."  *United States v. Ohle*, 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011), *aff'd*, 441 F. App'x 798 (2d Cir. 2011); *see also Skilling*, 554 F.3d at 557 ("[T]he government was in no better position to locate any potentially exculpatory evidence than was Skilling."); *United States v. Toomer*, 2018 WL 3745815 (D. Nev. Aug. 6, 2018) ("Creating such an obligation would require the government to prepare and ensure the completeness of the defense case.  Additionally, as is made clear by Toomer's arguments, he is in the best position to know what sorts of evidence would be exculpatory.").

As courts have recognized, it is untenable to require the government to sift through the discovery and analyze how a particular document may fit within hypothetical defense theories. That is especially true in a fraud and public corruption case such as this one.  The defendant is equally—and likely more—capable of conducting such searches himself.  *See Rubin/Chambers,* 825 F. Supp. 2d at 453-54 (denying pre-trial motion based on *Brady* to require government to identify and produce, in "bucketed" form, discrete collections of documents and electronic files that relate to four categories of transactions, and that such production be organized and formatted so as to indicate to which of those four categories each document or electronic file relates because the Court found "that *Brady* and its progeny impose no obligation on the Government to organize for Defendants in the format they design material already provided to them"); *id.* at 454 ("If the rule were otherwise, it would 'place prosecutors in the untenable position of having to prepare both sides of the case at once.'") (quoting *Ohle*, 2011 WL 651849 at *4).

## III.   <u>Conclusion</u>

Based on the foregoing, the United States respectfully requests that the Court deny the defendant's motion to compel.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Corey R. Amundson
Chief, Public Integrity Section

By:   *Edward P. Sullivan*
      Edward P. Sullivan
      Special Assistant United States Attorney (LT)
      Senior Litigation Counsel, Public Integrity Section
      Heidi B. Gesch
      Assistant United States Attorney
      Office of the United States Attorney
      2100 Jamieson Avenue
      Alexandria, VA 22314
      Tel: (703) 299-3700
      Fax: (703) 299-3981
      Edward.P.Sullivan@usdoj.gov
      Heidi.Gesch@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to the attorneys of

record for the defendant.

*Edward P. Sullivan*
Edward P. Sullivan

Dated:  November 14, 2022