IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:22-CR-00122 (RDA) |
| ) | |
| JULIO R. SOTOMAYOR ) | Count 1: 18 U.S.C. § 371 (Conspiracy) |
| (a/k/a "JACE SOTOMAYOR"; "J.R. ) | |
| SOTOMAYOR"; "WIZARD"), ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

**A.   Background**

1. Defendant JULIO R. SOTOMAYOR (a/k/a "JACE SOTOMAYOR," "J.R. SOTOMAYOR," and "WIZARD") was a retired colonel of the United States Air Force ("USAF"). Between in or about 2008 and in or about 2010, SOTOMAYOR worked at Headquarters Air Force, A2, Intelligence, Surveillance, and Reconnaissance Directorate ("HAF/A2"). SOTOMAYOR thereafter created two independent consulting firms, EAGLE MARKET GROUP ("EMG") and FEDERAL SECURITY AGENCY ("FSA"), which he owned and operated as sole proprietorships in Alexandria, Virginia within the Eastern District of Virginia. SOTOMAYOR held himself out as a "Senior Advisor / Executive Consultant (IC)."

2. Broadcasting Board of Governors ("BBG") was an independent federal agency that oversaw public service media networks, including Voice of America. The BBG changed its name to the U.S. Agency for Global Media ("USAGM") in or about August 2018.

3. DIANE D. STURGIS was employed as a contract specialist and contracting officer for the BBG's International Broadcast Bureau, Office of Contracts from in or about

November 2007 until at least in or about late September 2017. The Office of Contracts was responsible for soliciting, negotiating, awarding, and administering the BBG's contracts. STURGIS obtained an unlimited contract warrant, and her responsibilities included all aspects of the BBG's procurement process, including pre-solicitation negotiations, bid evaluations, contract awards and modifications, and post-award supervision and administration. STURGIS was a "public official" within the meaning of 18 U.S.C. § 201(a)(1).

4. PERSON A was STURGIS's relative. PERSON A formed COMPANY A in the Commonwealth of Pennsylvania on or about December 10, 2014. PERSON A and COMPANY A purportedly provided security and consulting services to SOTOMAYOR and EMG.

5. PERSON B was the owner, president, and sole director of COMPANY B, a government contractor located in the Eastern District of Virginia. In or about June 2013, PERSON B retained SOTOMAYOR and EMG to provide strategic consulting and project management services for COMPANY B. On or about January 20, 2014, PERSON B transferred COMPANY B stock to SOTOMAYOR and made him a minority owner of COMPANY B. PERSON B introduced SOTOMAYOR to STURGIS in early 2014.

6. COMPANY B provided staffing, IT solutions, data management, and analytical services to federal agencies, including the BBG. COMPANY B received several contracts, agreements, and task / purchase orders from the BBG that were awarded, supervised, and administered by STURGIS, including a blanket purchase agreement for professional and administrative staffing supplies and services that STURGIS awarded in or about late 2013.

7. Beginning in or about mid to late 2014, the USAF, SOTOMAYOR, PERSON B, and COMPANY B sought to use COMPANY B's blanket purchase agreement with the BBG as

2

a contracting vehicle to provide supplies and services to HAF/A2's Innovation Initiatives, which included "ACID," "DEWEY," "Smart Node Pod," and various "Special Projects."

8. On or about September 25, 2014, STURGIS and the BBG used COMPANY B's blanket purchase agreement to issue a purchase order for supplies or services (Contract No. BBG50-A-14-0040/0100 (later renumbered as BBG50-A-14-A-0040/0100)) and execute a series of military interdepartmental purchase request ("MIPR") agreements with the USAF (collectively, the "BBG/USAF contract"). The purchase order, modifications, and MIPRs were used by the USAF to procure over $30 million in services and supplies from COMPANY B between in or about September 2014 and in or about September 2017. Among other things, STURGIS served as the assigned contracting officer for the blanket purchase agreement, purchase order, modifications, statements of work, performance work statements, MIPRs, invoice processing / approvals, and vendor security approval processes.

9. SOTOMAYOR, EMG, and FSA provided consulting and subcontractor services to COMPANY B, including services related to the BBG/USAF contract for which SOTOMAYOR received compensation. Among other things, SOTOMAYOR served as a liaison between the USAF, COMPANY B and PERSON B, and the BBG and STURGIS, and he communicated frequently with STURGIS while he was within the Eastern District of Virginia.

**B.** <u>**Sotomayor and Sturgis's Fraud and Corruption Scheme**</u>

10. At or near the time when SOTOMAYOR, PERSON B, and COMPANY B were seeking to use COMPANY B's blanket purchase agreement with the BBG as a vehicle for the BBG/USAF contract, SOTOMAYOR discussed giving money to STURGIS by using a pass-through mechanism to disguise the payments to STURGIS. SOTOMAYOR and STURGIS

3

discussed providing money to STURGIS by hiring her relative, PERSON A, and paying the money to PERSON A. SOTOMAYOR and STURGIS also discussed PERSON A's background and work experience; having PERSON A form or use a business that appeared to be security-related to facilitate the pass-through payments to STURGIS; creating a business account to receive the payments from SOTOMAYOR; and taking additional steps to conceal the transfers to STURGIS.

11. SOTOMAYOR made the payments to STURGIS at least in part with the intent to influence her to perform official acts benefitting SOTOMAYOR, his consulting companies, and PERSON B and COMPANY B. In exchange for the payments, STURGIS performed official acts and provided preferential treatment to SOTOMAYOR, his consulting companies, and PERSON B and COMPANY B, including with respect to the DOD/USAF contract(s) involving STURGIS and the BBG.

12. After their discussion, STURGIS drafted a fabricated resume for PERSON A and, on or about November 10, 2014, sent an e-mail to SOTOMAYOR with the fabricated resume attached. The resume listed false professional and educational qualifications and experiences for PERSON A.

13. PERSON A, in or about December 2014, formed COMPANY A and created a business bank account for COMPANY A.

14. Between in or about December 2014 and in or about October 2017, SOTOMAYOR contacted STURGIS and periodically met with her in the Eastern District of Virginia and elsewhere. During certain meetings, SOTOMAYOR gave STURGIS envelopes containing checks, totaling $150,000, issued by SOTOMAYOR and EMG for COMPANY A.

SOTOMAYOR, at least occasionally, also provided STURGIS with fabricated invoices from COMPANY A to EMG, purportedly for consulting work performed by COMPANY A.

15. PERSON A and COMPANY A did not provide consulting work for EMG, and PERSON A never met with SOTOMAYOR or communicated with him.

16. After receiving the envelopes from SOTOMAYOR, STURGIS provided the EMG checks to PERSON A. PERSON A deposited the checks into PERSON A's newly created business account for COMPANY A. PERSON A then transferred most of the EMG money from the business account to a personal account. PERSON A, in general, withdrew the money from the personal account (and the remaining funds in the business account) as cash, wrote checks to STURGIS when she needed the money, and used the funds to pay joint expenses for STURGIS and PERSON A. STURGIS typically deposited the money received from PERSON A into one of STURGIS's personal bank accounts. SOTOMAYOR and EMG thereafter issued IRS Forms 1099-Misc to COMPANY A to make the purported consulting work appear legitimate.

17. SOTOMAYOR, STURGIS, PERSON A, and others took the following overt acts, among others, in the Eastern District of Virginia and elsewhere to further the conspiracy and effect its objects.

18. On or about September 12, 2014, after PERSON B and STURGIS discussed a Department of Defense ("DOD") project (on or about September 10, 2014), STURGIS sent a follow-up e-mail to PERSON B asking whether PERSON B wanted to discuss a contract vehicle for COMPANY B's military projects. PERSON B replied, "Answer is yes yes yes. Have this tech innovation project DOD wants us to take on. They are looking for a great CO. Thought of you. Can you help?" STURGIS replied, "Yes."

5

19. On or about September 19, 2014, PERSON B sent an e-mail to STURGIS about the BBG/USAF contract stating in part, "Remember [SOTOMAYOR]. He is helping us with this. He asked for your contact info. I am going to send him your email address and phone number. He is talking with the users and is at the Pentagon today."

20. On or about September 25, 2014, after STURGIS had extensive communications with SOTOMAYOR, PERSON B, and BBG and USAF officials, STURGIS signed a purchase order for supplies and services to COMPANY B totaling approximately $11,000,000 that was issued pursuant to COMPANY B's blanket purchase agreement.

21. On or about November 10, 2014, after STURGIS created a fabricated resume for PERSON A, STURGIS sent an e-mail to SOTOMAYOR attaching the fabricated resume and stating, "Hi [SOTOMAYOR], Attached is [PERSON A's] resume, also do you want to schedule to meet this week." SOTOMAYOR replied, "Let's catch latter part."

22. On or about December 9, 2014, SOTOMAYOR sent an e-mail to STURGIS scheduling a meeting with STURGIS and USAF officials at the Pentagon on or about December 16, 2014. STURGIS also invited STURGIS to attend a holiday gathering on the same day at a bar / restaurant in Arlington, Virginia within the Eastern District of Virginia.

23. On or about December 10, 2014, PERSON A incorporated COMPANY A in Pennsylvania.

24. On or about December 15, 2014, SOTOMAYOR issued a $30,000 check (#1802) from EMG to COMPANY A with the memo line "Prof Cnsltg. – Invoice Dec." SOTOMAYOR and PERSON B also called STURGIS on the same day.

6

25. On or about December 16, 2014, STURGIS met with SOTOMAYOR in the Eastern District of Virginia and attended the meetings at the Pentagon. On the same day, PERSON B sent an e-mail to STURGIS stating in part, "Heard you had some good meetings at the Pentagon and you were absolutely fantastic. Got lots of great feedback."

26. On or about December 17, 2014, PERSON A opened a business checking account for COMPANY A and, after receiving SOTOMAYOR / EMG's $30,000 check from STURGIS, deposited the check into COMPANY A's business account.

27. On or about December 17, 2014, COMPANY B submitted its initial invoices to STURGIS for the BBG/USAF contract.

28. In or about January 2015, after COMPANY B and PERSON B complained to STURGIS that COMPANY B was having difficulty getting paid on its initial invoices, STURGIS took steps to fix the problem with DOD's Defense Financial Accounting System ("DFAS").

29. On or about January 13, 2015, STURGIS sent an e-mail to SOTOMAYOR, PERSON B, and others at USAF attaching a signed memorandum delegating authority to a USAF official to serve as the contracting officer technical representative ("COTR"). The COTR, STURGIS, SOTOMAYOR, and PERSON B communicated frequently thereafter regarding contract performance issues for the BBG/USAF contract.

30. In or about February 2015, after SOTOMAYOR and PERSON B urged STURGIS to do so, STURGIS agreed to serve as the approver (signer / validator) of COMPANY B's invoices in DOD's Wide Area Workflow ("WAWF") electronic payment system.

7

31. On or about February 18, 2015, STURGIS signed a contract modification that, among other things, incorporated WAWF clauses that allowed STURGIS to approve COMPANY B's invoices in WAWF. STURGIS submitted her request for access to WAWF on or about March 4, 2015.

32. On or about February 27, 2015, PERSON B sent an e-mail to STURGIS proposing language for STURGIS to include in an e-mail to USAF officials who were expressing concerns about STURGIS's involvement in the WAWF system. STURGIS cut and pasted PERSON B's draft response into a reply e-mail and sent the e-mail to USAF officials.

33. On or about April 1, 2015, SOTOMAYOR issued a $30,000 check (#1842) from EMG to COMPANY A with the memo line "Prof Cons – [UI]." SOTOMAYOR also provided STURGIS with a fabricated invoice, dated March 31, 2015, purportedly from COMPANY A to EMG, for security and consulting services.

34. On or about April 2, 2015, after PERSON A received SOTOMAYOR / EMG's $30,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

35. On or about April 8, 2015, after SOTOMAYOR called STURGIS and sent her e-mails agreeing to meet and escort her, SOTOMAYOR and STURGIS met with USAF officials at the Pentagon. STURGIS also signed a DD Form 254, certifying the security requirements, classification guidance, and handling procedures for classified material made available to COMPANY B's contractors and subcontractors as part of the BBG/USAF contract.

36. Between in or about May 2015 and in or about September 2015, SOTOMAYOR and STURGIS communicated frequently to discuss, among other things, potential new matters,

8

having STURGIS approve an invoice in WAWF for COMPANY B, having STURGIS exercise the next option year on the BBG/USAF, processing a new MIPR, funding for the fiscal year, and, upon SOTOMAYOR's urging, having STURGIS assist with publishing a BBG request for information for a new solicitation involving the Air National Guard.

37. On or about August 11, 2015, SOTOMAYOR sent an e-mail to STURGIS asking her to sign and recommend approval of a statement of work for the DEWEY project, which related to exercising the first option year on the BBG/USAF contract. STURGIS complied with SOTOMAYOR's request and signed the statement of work on or about August 14, 2015.

38. On or about September 17, 2015, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M003) signed by STURGIS. The contract modification exercised the first option year on the BBG/USAF contract with COMPANY B and clarified that the BBG/USAF contract included four option years.

39. On or about September 30, 2015, after STURGIS assisted SOTOMAYOR in getting the BBG's approval of MIPR agreements, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M004) signed by STURGIS. The contract modification added approximately $475,650 to the BBG/USAF contract, among other changes.

40. In or about October 2015, STURGIS approved COMPANY B's pending invoice in WAWF for approximately $1,738,419.03.

41. On or about February 8, 2016, SOTOMAYOR sent an e-mail to STURGIS asking for the BBG's approval of a MIPR package (totaling approximately $200,000).

42. On or about February 12, 2016, SOTOMAYOR sent an e-mail to STURGIS asking her to sign draft statements of work to modify and extend a portion of COMPANY B's

contract regarding the ACID and DEWEY Projects. STURGIS complied with SOTOMAYOR's request, signing both statements of work and recommending their approval on or about February 16, 2016.

43. On or about February 24, 2016, after STURGIS obtained the necessary approvals within the BBG, STURGIS sent an e-mail to SOTOMAYOR attaching the signed MIPR.

44. On or about February 25, 2016, STURGIS signed a contract modification (M005) adding approximately $200,000 to the BBG/USAF contract, among other changes.

45. On or about March 5, 2016, SOTOMAYOR issued a $30,000 check (#2051) from EMG to COMPANY A with the memo line "Prof Conslt Spt Inv 16-1." SOTOMAYOR also provided STURGIS with a fabricated invoice, dated March 1, 2016, purportedly from COMPANY A to EMG, for security and consulting services.

46. On or about March 8, 2016, SOTOMAYOR sent an e-mail to STURGIS, confirming their lunch meeting.

47. On or about March 10, 2016, after STURGIS provided SOTOMAYOR / EMG's $30,000 check to PERSON A, PERSON A deposited the check into COMPANY A's business account.

48. On or about April 27, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M007) signed by STURGIS. The contract modification added approximately $7,156,952.88 to the BBG/USAF contract, among other changes.

49. On or about April 28, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M006) signed by STURGIS on or about April 16,

10

2016. The contract modification added approximately $1,350,000 to the BBG/USAF contract, among other changes.

50. On or about June 21, 2016, SOTOMAYOR issued a $30,000 check (#2095) from EMG to COMPANY A with the memo "Inv 2016-01 EMG."

51. On or about June 27, 2016, after PERSON A received SOTOMAYOR / EMG's $30,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

52. On or about September 8, 2016, STURGIS sent an e-mail to PERSON B attaching a contract modification (M008) signed by STURGIS. The contract modification added approximately $197,000 to the BBG/USAF contract, among other changes.

53. On or about September 29, 2016, STURGIS signed a contract modification (M009). The contract modification added approximately $250,000 to the BBG/USAF contract, among other changes.

54. On or about November 14, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M010) signed by STURGIS. The contract modification added approximately $177,795 to the BBG/USAF contract, among other changes.

55. On or about December 7, 2016, STURGIS completed a Contractor Performance Assessment Reporting System ("CPARS") evaluation for COMPANY B and PERSON B upon PERSON B's request.

56. On or about December 23, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M011) signed by STURGIS. The contract modification added approximately $45,337.39 to the BBG/USAF contract, among other changes.

57. On or about December 29, 2016, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M012) signed by STURGIS. The contract modification added approximately $650,000 to the BBG/USAF contract, among other changes.

58. On or about January 23, 2017, STURGIS signed CPARS evaluations for COMPANY B and PERSON B.

59. On or about March 16, 2017, STURGIS sent an e-mail to SOTOMAYOR and PERSON B attaching a contract modification (M013) signed by STURGIS. The contract modification added approximately $1,102,089 to the BBG/USAF contract, among other changes.

60. On or about April 5, 2017, SOTOMAYOR met with STURGIS and provided her with notes and paperwork relating to a modification and MIPR that would add approximately $551,000 to the BBG/USAF contract.

61. On or about April 10, 2017, SOTOMAYOR issued a $15,000 check (#2186) from EMG to COMPANY A with the memo "Prof Svcs Inv 2017-01."

62. On or about April 13, 2017, after STURGIS assisted in obtaining the BBG's approval of a MIPR agreement, STURGIS sent an e-mail to SOTOMAYOR and PERSON B, attaching a contract modification (M014) signed by STURGIS. The modification added approximately $551,000 to the BBG/USAF contract, among other changes.

63. On or about May 1, 2017, after PERSON A received SOTOMAYOR / EMG's $15,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

64. On or about June 1, 2017, STURGIS signed two contract modifications (M015 and M016), adding approximately $2,100,000 and $30,000, respectively, to the BBG/USAF contract among other changes.

65. On or about June 19, 2017, STURGIS signed and certified a DD Form 254 contract security classification specification for the BBG/USAF contract.

66. On or about June 21, 2017, STURGIS signed a contract modification (M017), adding approximately $400,000 to the BBG/USAF contract, among other changes.

67. On or about June 26, 2017, STURGIS signed and recommended approval of statements of work to modify and extend the BBG/USAF contract as to the DEWEY and ACID projects.

68. On or about July 25, 2017, STURGIS signed a contract modification (M018), adding approximately $4,175,334.72 to the BBG/USAF contract, among other changes.

69. On or about August 9, 2017, STURGIS signed a contract modification (M019), adding approximately $1,993,243.29 to the BBG/USAF contract, among other changes.

70. On or about September 18, 2017, STURGIS signed a contract modification (M020) exercising the two remaining option years on the BBG/USAF contract, which extended the performance period for COMPANY B through in or about September 24, 2019.

71. On or about October 4, 2017, SOTOMAYOR issued a $15,000 check (#2248) to COMPANY A with the memo "Cnst Spt Inv – 17-03."

72. On or about October 13, 2017, after PERSON A received SOTOMAYOR / EMG's $15,000 check from STURGIS, PERSON A deposited the check into COMPANY A's business account.

73.     Between in or about December 2014 (when PERSON A opened the business account for COMPANY A) and in or about early October 2020 (when PERSON A closed the business account for COMPANY A), PERSON A transferred most of the $150,000 from SOTOMAYOR and EMG to PERSON A's personal account and, in general, forwarded the money to STURGIS by check, withdrew it as cash, and used it to pay STURGIS's joint expenses. PERSON A did likewise with funds remaining in the business account.

74.     Between in or about 2014 and in or about 2017, SOTOMAYOR and EMG issued IRS Forms 1099-Misc to COMPANY A for the payments from EMG to COMPANY A.

C. **Other Relevant Conduct**

75.     In addition to paying approximately $150,000 to STURGIS, SOTOMAYOR used his consulting company, EMG, to engage in similar conduct with PERSON C, a government contractor with DOD/USAF, and PERSON C's relative. PERSON C, among other things, served as a senior technical consultant and chief technologies officer ("CTO") of HAF/A2I's Q Group. Between in or about late December 2013 and in or about late October 2019, SOTOMAYOR, through EMG, made approximately $185,000 in payments to PERSON C by issuing periodic check payments to PERSON C's relative purportedly for consulting work. PERSON C's relative did not perform any services for SOTOMAYOR or EMG. SOTOMAYOR made the payments to PERSON C at least in part to influence PERSON C to perform official acts and cause other officials to perform official acts benefitting SOTOMAYOR, his consulting companies, and PERSON B and COMPANY B. In exchange for the payments, PERSON C performed official acts and caused others to perform official acts, and PERSON C provided preferential treatment to SOTOMAYOR, his consulting companies, and

14

PERSON B and COMPANY B, including with respect to the same DOD/USAF contract(s) involving STURGIS and the BBG.

76.     Between in or about early 2015 and in or about mid-2019, in the Eastern District of Virginia and elsewhere, SOTOMAYOR and others executed and attempted to execute a scheme and artifice to defraud the United States and the BBG (now known as USAGM), and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises—that is, SOTOMAYOR, PERSON B, and COMPANY B submitted, and caused to be submitted, invoices from COMPANY B to the DOD/USAF that included requests to pay government servicing fees that were supposed to be for the BBG. Substantial portions of the government servicing fees were not used for the benefit of the BBG; instead, the funds were paid to SOTOMAYOR.

77.     SOTOMAYOR also engaged in a scheme to defraud involving COMPANY D, and its owners and officers, PERSONS D1 and D2. At all relevant times, COMPANY D was a government contractor in the Eastern District of Virginia. COMPANY D, with SOTOMAYOR's assistance, primarily received government contracts with the Defense Information Systems Agency ("DISA"). SOTOMAYOR received compensation from COMPANY D in the form of payments to EMG or SOTOMAYOR's relative for providing program management services to COMPANY D related to the DISA contract. At the same time, SOTOMAYOR was providing contract management services to DISA and receiving payments to FSA for overlapping work on the same contract. COMPANY B also served as a subcontractor on COMPANY D's contracts with DISA.

## D.  **Conclusion**

78.  This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

79.  The actions of the defendant as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

                              Respectfully submitted,

                              Jessica D. Aber
                              United States Attorney

                              Corey R. Amundson
                              Chief, Public Integrity Section
                              U.S. Department of Justice

By: _/s/ Edward P. Sullivan_____
      Edward P. Sullivan
      Special Assistant United States Attorney (LT)
      Senior Litigation Counsel, Public Integrity Section
      Heidi B. Gesch
      Assistant United States Attorney
      United States Attorney's Office
      2100 Jamieson Avenue
      Alexandria, Virginia 22314
      Tel:  703-299-3700
      Edward.P.Sullivan@usdoj.gov
      Heidi.Gesch@usdoj.gov

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Julio R. Sotomayor, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate and that, had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Julio R. Sotomayor
Defendant

I am Julio R. Sotomayor's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to facts is an informed and voluntary one.

John J. Pease III, Esq.
Attorney for Julio R. Sotomayor