1

                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                        Alexandria Division

3    UNITED STATES OF AMERICA,        :     Criminal Case
                                      :     No. 1:22-cr-00122-RDA-1
4                   Plaintiff         :
           v.                         :
5                                     :
     JULIO R. SOTOMAYOR,              :
6                                     :     August 30, 2023
                    Defendant         :     11:15 a.m.
7    ............................     :     ........................

8                 TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.
9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   FOR THE PLAINTIFF:        EDWARD P. SULLIVAN
                               HEIDI B. GESCH
12                             UNITED STATES ATTORNEY'S OFFICE
                               EASTERN DISTRICT OF VIRGINIA
13                             2100 Jamieson Avenue
                               Alexandria, VA  22314
14                             703-299-3700

15   FOR THE DEFENDANT:        JOHN J. PEASE, III
                               MORGAN, LEWIS & BOCKIUS LLP
16                             1701 Market Street
                               Philadelphia, PA  19103
17                             215-963-5000

18                             JONATHAN P. YORK
                               MORGAN, LEWIS & BOCKIUS LLP
19                             1111 Pennsylvania Avenue, NW
                               Washington, DC  20004
20                             202-739-5119

21

     OFFICIAL COURT REPORTER:   REBECCA STONESTREET, RPR, CRR
22                              U.S. District Court, 9th Floor
                                401 Courthouse Square
23                              Alexandria, Virginia  22314
                                (240) 426-7767
24
                          ( pages 1 - 57 )
25
              COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1                        **P R O C E E D I N G S**

2              COURTROOM CLERK:  Criminal number 2022-122,

3    United States of America versus Julio Sotomayor.  Counsel,

4    please note your appearances for the record.

5              MR. SULLIVAN:  Good morning, Your Honor.

6    Edward Sullivan and Heidi Gesch for the United States.

7              THE COURT:  Good morning.

8              MR. PEASE:  Good morning, Your Honor.  John Pease and

9    Jonathan York on behalf of the defendant, Mr. Sotomayor.

10              THE COURT:  Good morning.  Mr. Sotomayor is also

11    present.  This matter comes on today for a sentencing.  Are

12    there any corrections, deletions, or modifications to the

13    presentence report prepared in the matter?  I know that there

14    are some issues that we need to resolve as far as the

15    calculation of the guidelines and the like.  But as far as the

16    substance of the presentence report, are there any corrections,

17    deletions, or modifications?

18              MR. PEASE:  No, nothing beyond the objections you're

19    aware of, Your Honor.

20              THE COURT:  Is there any evidence that the government

21    wants to present?

22              MR. SULLIVAN:  No, Your Honor.

23              THE COURT:  Any evidence from the defendant?

24              MR. PEASE:  Your Honor, I would like to have the

25    opportunity for the defendant's wife and son to say a few words

1    to the Court.

2        THE COURT:  Sure.  Is the government fine with them

3    being able to do this without the benefit of cross-examination,

4    or would you like the opportunity to cross-examine?

5        MR. SULLIVAN:  Your Honor, we just learned about this.

6    So if it is going to be character-related information, then we

7    don't need cross-examination.  If it's going to be substantive,

8    then we may like to reserve our opportunity to cross-examine.

9        THE COURT:  We'll do that with reservation.  Why don't

10   we go ahead and do this.  Why don't we call him to the stand,

11   and I'll let him be sworn.

12       MR. PEASE:  The defendant would call

13   Carlos Ibarra.

14        (Oath administered by courtroom deputy clerk.)

15   **(CARLOS IBARRA, having been duly sworn, testified as follows:)**

16            **EXAMINATION BY COUNSEL FOR DEFENDANT**

17   **BY MR. PEASE:**

18   Q.  Good morning, Mr. Ibarra.

19   A.  Good morning.

20   Q.  Can you tell the Court, how do you know the defendant,

21   Julio Sotomayor?

22   A.  Julio is my dad, sir.

23   Q.  And when you say he's your dad, when did you first meet him?

24   A.  I met him when I was three.  I was adopted by my mom in

25   Ecuador after I was abandoned on February 23rd or 24th.  The

4

1    date is still unsure.  My dad dated my mom when I turned three,

2    and that's when I first met him, and he's been in my life ever

3    since.  So I call him Dad.

4           THE COURT:  As I understand it, sir, you're not the

5    biological child of either your mother or your father, but you

6    consider them your mother and father?

7           THE WITNESS:  That is correct, Your Honor.

8           THE COURT:  And you're the young person that, as you

9    say, was abandoned in a foreign country.  I think the record

10   will reflect that that's how your mother found you, under

11   something or other, and that she took you without even knowing

12   you at all?

13          THE WITNESS:  Yes.  I went to -- one of her friends had

14   a clinic, so just to check up to see if my health was okay, and

15   then they started filing the adoption paperwork.

16          THE COURT:  So as far as you're concerned,

17   Mr. Sotomayor is your father?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Right.  Thank you.

20   BY MR. PEASE:

21   Q.  And how old are you?

22   A.  I am 30.

23   Q.  Do you attend college?

24   A.  I am currently finishing up my last semester to graduate

25   with a bachelor's in business, yes.

1   Q.  Can you describe for us your relationship with your father?

2   A.  My relationship with my dad is really good.  We didn't have

3   the father-son bonding experience when I was younger because of

4   his deployments, but recently we have taken that up, ever since

5   he has retired and has been able to be home more.  He's been an

6   admiration of mine.  I kind of aspire to be like him in the

7   future.  He's taught me almost everything that I know, and has

8   given me most of my hobbies as well.

9   Q.  Can you give the Court an example or two how your father has

10  supported you through some difficult circumstances?

11  A.  Oh, definitely.  A few years back I had a bit of a mental

12  breakdown, and had a bit of a suicidal episode as well.  I left

13  the house, kind of roamed around trying to figure out myself.

14  My dad took me back in after I had failed, and he kind of put

15  aside all the anger and worry and fear that he had during those

16  moments to build me back up to what I should be at that moment.

17        He's taken me under his wing, kind of propelled me to

18  find better jobs, go back to college, finish up, find out what I

19  actually want to do in this world.  He's kind of been my

20  backbone these past couple of years to kind of get me back on

21  track.

22  Q.  Have there been any other members or friends of yours who

23  your father has served as a mentor or father figure for?

24  A.  Oh, there's a long list, yes.  So we have a bunch of family

25  members who are from single mothers, we have a whole bunch of

1    family members whose fathers have died, and my dad has kind of

2    taken up the role as their father figure as well, to guide them

3    in whatever necessary -- in whatever way necessary.

4    Q.  Can you talk about a couple of them for us?

5    A.  Yeah.  The one that clearest comes to mind would be my best

6    friend from high school.  He lost his father when he was, I

7    believe, 13, and ever since my dad has been in his life, he's

8    kind of looked at him as a father figure.  He's helped advise

9    him in college deals, personal deals, issues with, you know, the

10   loss and all that.

11        And any time that he comes over to the house, it's

12   always kind of like a relationship like I have with my dad as

13   well; he's kind of become his father figure and his father,

14   really.

15   Q.  Are there other friends or family members who have lost

16   their fathers, who have received financial or other support from

17   your dad?

18   A.  Yes.  My cousin's stepdad, he died a couple of months ago,

19   and at the moment we found out, my dad kind of decided that he

20   would take it upon himself to help in whatever way possible.

21   He's been there calling them, making sure they're okay, making

22   sure they're healthy, that they're able to feed themselves, able

23   to clothe themselves, whatever necessary.  He's kind of been

24   that role for them.

25   Q.  Are there any family friends who your dad has paid their

1    college tuition for?

2    A.  Oh, yes.  We have a family friend who went to do university

3    in Australia.  She decided that -- well, her father died right

4    before it happened.  She chose her major, and my dad decided

5    that he was going to be the one that would help her family out,

6    because her mom was going through a hard time after being a

7    widow and having to take care of all the, like, house stuff and

8    all of the end-of-life things for them.

9          So he decided that he was going to help her out in

10   whatever way possible so that she could become something,

11   because she was a very -- she has a lot of potential, and he saw

12   that in her.

13   Q.  And what were some of the ways he helped her?

14   A.  He's been the one that's helped her pay for the tuition for

15   college.  And also, if anything was necessary for her, like

16   advice or whatever, he would be there to call her no matter what

17   time of day it was.  Because she lives in Australia, so because

18   of the time zones.

19   Q.  Are there family members of yours who live in Ecuador who

20   receive support from your father?

21   A.  Most of my family, yes.  Especially my uncle, who also has

22   fallen on hard times recently, and my dad has been the one who

23   has made sure that he is fed, he is clothed, all of his medical

24   issues can be addressed, that he has a roof over his head,

25   running water, all the stuff necessary until he's able to get

1    back on his feet.  And he's been doing that for a couple of

2    years, just trying to help him out so they're good.

3    Q.  During the course of your lifetime, has your father been

4    away on extended military deployments?

5    A.  Multiple times, yes.

6    Q.  Can you talk about, briefly, the sacrifices that your family

7    has made to support his military career?

8    A.  Yes, definitely.  I mean, the mere fact of not having my dad

9    presently there was something that we had to get used to.  He

10   was always very straightforward with us about what our role as a

11   military family was going to be, that he was going to be away.

12   But even though he was miles and miles away, on the other side

13   of the world, he always made sure that he would be in contact

14   with us, making sure that we're good, that our -- that my

15   schooling was done, that my stepsister's schooling was good,

16   that we're taking care of the house, that we're healthy, that

17   we're fine.  Just kind of keeping us updated so we wouldn't

18   worry about him.  So he made himself kind of present, even

19   though physically he wasn't there for us.

20   Q.  Is your mother experiencing some medical issues that your

21   father helps her with?

22   A.  Yes.  Over the past couple of years my mom has had issues

23   with her back and with arthritis, and some, like, nerve issues.

24   And my dad has been, like, her primary caretaker.  He's the one

25   that has, you know, taken her to the hospital, waited by her

```
1    side during surgeries, gone to every single doctor's visit.

2    Every time she needs medicine, every time she's had night pains

3    or whatever, he's been the one that's help her to soothe.

4         She gets cramps at night, so he wakes up, helps her

5    deal with those, makes sure that she's okay, makes sure that

6    she's eating well, taking all the medicines, everything that

7    needs to be done.  He's been kind of like her base of support

8    during this whole entire medical issue.

9    Q.  What would you say are your dad's greatest qualities?

10   A.  Well, his greatest qualities are his generosity, his

11   humility, his kind of selflessness.  He has no issue putting

12   himself to the side, and needs, in order to help anybody else.

13        If anybody, even unknown people, come to him asking for

14   advice or anything, he will happily give it to you.  He has no

15   worries, no qualms, no restrictions when it comes to that.  He

16   doesn't hesitate to help whoever needs help.

17   Q.  Is there anything else that you would like the Court to

18   consider in deciding what a fair sentence would be in this case?

19   A.  I mean, over this past year, I've seen how this has affected

20   my dad, and I've seen how he's kind of been mentally and

21   physically drained.  He's emotionally drained, even though he

22   still puts a smily face trying to make everybody not as worried

23   or concerned.

24        But he has been such a rock for our family and such a

25   foundational pillar for the whole entire family, both his and my
```

1    mom's, that we really need him in the house.  My mom especially

2    needs him with us.  And I would really ask the Court to consider

3    that, and consider keeping him in our lives as long as we

4    possibly can.

5          MR. PEASE:  Thank you, Your Honor.  I have no other

6    questions.

7          THE COURT:  Any questions from the government?

8          MR. SULLIVAN:  No, Your Honor.

9          THE COURT:  Sir, from the record I can see that your

10   father served our country well for a good long time, almost

11   three decades; was able to overcome a lot of odds, being a

12   person that was not born in the United States.  He studied hard,

13   went to school, served our country well, received a lot of

14   distinguished service medals, and was basically a pillar of the

15   United States military.

16         But has he discussed with you what has caused him to be

17   before this court?

18         THE WITNESS:  He has given me, like, a brief overview

19   of what happened here.

20         THE COURT:  Well, essentially, and the government has

21   suggested, and your father has pled guilty to basically a scheme

22   involving bribery; in other words, trying to get an advantage by

23   paying another person to do something for his financial

24   advantage.

25         Is that consistent with the man that you know?

1          THE WITNESS:  Absolutely not.

2          THE COURT:  Was there anything that you were aware of

3     that would cause a person who has been a pillar of the community

4     to allow himself to be corrupted so much?

5          THE WITNESS:  My dad is very generous, but also very

6     trusting of people that he holds dear.  And if he puts someone

7     in high regard based on whatever he's learned from them, he

8     tends to trust in them.

9          THE COURT:  What if I were to suggest to you that in

10    this instance it wasn't that, but rather he was facilitating a

11    scheme where he used a straw person to accomplish something

12    illegal and corrupt?

13         THE WITNESS:  That wouldn't be my dad.  Nothing of what

14    I've ever known of him would ever point me to think that he

15    would be capable of doing something like that.

16         THE COURT:  Any questions as a result of the Court's

17    questions?

18         MR. SULLIVAN:  No, Your Honor.

19         MR. PEASE:  No other questions, Your Honor.

20         THE COURT:  Thank you, sir.  You may step down.

21         Next witness.

22         MR. PEASE:  Maria Ibarra.

23         THE COURT:  Come on up, ma'am.

24         (Oath administered by courtroom deputy clerk.)

25         THE COURT:  If you could sit down, you need to speak

1    close to the mic so we can hear you.

2         THE WITNESS:  Thank you, Your Honor.

3      **(MARIA IBARRA, having been duly sworn, testified as follows:)**

4              **EXAMINATION BY COUNSEL FOR DEFENDANT**

5    **BY MR. PEASE:**

6    Q.  Good morning, Ms. Ibarra.  How do you know the defendant,

7    Mr. Julio Sotomayor?

8    A.  I met him in Ecuador through friends, and his charisma and

9    humanity and generosity make me put potential on him and talk to

10   him, and we fell in love.  And we had a relationship, and he

11   gave me his share, his wings, to fly together in this new

12   experience of a new country, helping me raise my son.

13        So he has not hesitate on advising and helping and

14   supporting me in all this journey.

15   Q.  When you first met Mr. Sotomayor, you were -- he was on a

16   deployment to Ecuador.  Is that correct?

17   A.  Yes, sir.

18   Q.  And eventually you married?

19   A.  We married.  We planned to marry on September 11th.  In the

20   afternoon of that, we had family members and friends come to

21   Alexandria to do a little reception, and Jays had to do

22   something at the Pentagon that morning, and he did went and we

23   stayed fixing, you know, the things and trying to do the proper

24   things for later.

25        And I was having coffee when I saw the TV and all the

1    success that -- all the tragedy that happened that day, as you

2    all know.  And I was in shock looking that.  I was not even

3    married.  I was going to be a widow before getting married.  I

4    didn't know nothing about him.  We call and no answer.  I

5    thought that he was dead.

6    Q.  So your husband was in the Pentagon when the 9/11 plane

7    crashed?

8    A.  Yes.

9    Q.  What happened after that with respect to your wedding?

10   A.  After, of course, we postpone.  There was not groom to do

11   the ceremony.  And he appeared like 12, 13 hours later, all

12   messed up, and I almost throw myself from the fourth floor,

13   Your Honor, to his arms, with happiness and joy that he was

14   alive.  And with mixed feelings, we were happy to have him, but

15   on the other side, we were so sad of looking all this situation,

16   all many friends of him were dead and it was chaos.

17          My family from Ecuador were in shock.  They didn't know

18   how to consolate [sic] over all these hours and to help Jace.

19   We went to bed, and then Jace, at 6:00 in the morning, he was

20   ready with his gear and his combat suit --

21          THE COURT:  If I can interrupt you.  When you say Jace,

22   is that a nickname that you use for Mr. Sotomayor?

23          THE WITNESS:  He's my *osito*, but Jace is a military

24   nickname that they put.

25          THE COURT:  Just making sure the record is clear.

1    A.  So he was ready to go, to help and to deploy or whatever

2    other orders he was going to have, and he promised that he would

3    return.

4    Q.  Were you eventually married?

5    A.  We married.  Yes, we married.  He keeps his word and we

6    married.  And then he was deployed to Afghanistan and to that

7    region to help fight the terrorists.

8    Q.  Can you describe to the Court some of the ways Jace has been

9    a father to your son?

10   A.  He has been a wonderful father for my son, for his two

11   daughters from his previous marriage.  He has been responsible,

12   a mentor.  He has even taught me the things that I need to know

13   to live in this American world.  He has been responsible,

14   caring, protective, advising, all three, with no exception and

15   difference.

16   Q.  Can you give the Court an example or two of how your husband

17   has helped others besides just you and your son?

18   A.  Well, Jace has an invaluable range of different aspect of

19   his personality.  He has responsibility, friendly, gentleman,

20   combined with his generosity of helping the people in need.

21        I have seen with my family, with his family in

22   different occasions and relatives and other friends that need

23   support, guide, advice.  So he has helped in many ways.  Even

24   financially, he never hesitate to help others in need.  He has a

25   big heart.

1    Q.  Can you give us an example of that?

2    A.  Example, like my brother that's a lawyer also in Ecuador, he

3    was struggling in situations due to the political situation

4    there.  So my husband has helped him and the family to get

5    together again in all circumstances, in his illness, feeding the

6    family, guiding him so he can stand again.

7    Q.  Did your father's brother die in a tragic accident a few

8    years ago?  Did Jace' brother die in an accident a few years

9    ago?

10   A.  Yes, sir.  Jace' little brother, which he was a Marine, died

11   in a tragic accident.  He was killed by a car, and it was a

12   hit-and-run.  So Julio was devastated by that.  It was

13   everything for him.  He put to one side his pain and discomfort

14   and suffer, and he stand to honor his brother and to help his

15   widow and their siblings, and his mother, that is an older

16   woman, and give him all the honors that he as a military can

17   give to another military Marine that have served his nation.

18        It was wonderful to see all the respect that all the

19   people in the community of him, in Virginia, came to shake Jace'

20   hands to say how much his brother appreciate him and how much

21   they, those two brothers Sotomayor, have helped the community

22   and the nation.

23   Q.  Do you rely on Jace for financial and other support?

24   A.  I do.

25   Q.  Can you tell us how?

1    A.  He's so responsible.  He has helped me in all the issues

2    that I have, struggling, my medical situation.  He has never

3    hesitate to help me and support me and help even my son that was

4    in difficult moments.  He has always, always been so responsible

5    for us.

6    Q.  Can you describe briefly for the Court how the observations

7    you have made about how this case has had an impact on

8    Mr. Sotomayor, and how it's changed him?

9    A.  It has been very sad for me to see him, how he has feel

10   waste.  He's always proud his honors that he has had to serve

11   this nation.  He has become more humble and his health has

12   deteriorate.  His emotionally, physically have been -- he has

13   been struggling with that.  And even with that situation, he has

14   put his mind in the family to be the backbone of us, and don't

15   let us down, and be there for us always.

16         He was supporting our daughter that just had a baby,

17   unconditionally.  She had a very bad and difficult pregnancy, so

18   he has been present for him -- for her.

19         And it's an honor to be by his side, honestly.  I mean,

20   he's everything for me.  He means the world for us, for my

21   family.  Back in Ecuador, he's very respect and honor.  And

22   that's my family and friends, but all over the world he has

23   touched the heart and the mind of many people.

24   Q.  Is there anything else you would ask the Court to consider

25   in deciding on a fair sentence in this case?

1    A.  My Honor, it is implausible for us.  He's everything.  He's

2    a role model for us, for the people that we surround, and I beg

3    you to consider him like to be around us for many years.  His

4    unconditional love, patience, and guide is needed in our home.

5            MR. PEASE:  Thank you, Your Honor.

6            THE COURT:  Any questions from counsel?

7            MR. SULLIVAN:  No, Your Honor.

8            THE COURT:  Thank you, ma'am.  You may step down.

9            Any other witnesses, counsel?

10           MR. PEASE:  No, Your Honor.

11           THE COURT:  I'll hear argument from the government

12   first, and then I'll hear argument from the defense, and then

13   we'll give Mr. Sotomayor, if he wants to, an opportunity to

14   allocute.

15           MR. SULLIVAN:  Your Honor, just to be clear, do you

16   want to address the objections to the PSR first?

17           THE COURT:  Let's do that.  Let's do the Ms. Sturgis

18   issue first.  Let's work our way through that.

19           MR. SULLIVAN:  Sure.  Thank you, Your Honor.  The

20   government and the probation office agree that Ms. Sturgis held

21   a sensitive position and was a high level decisionmaker.  Both

22   factors apply here, but, just to be clear, legally, it's

23   mutually exclusive.  The Court doesn't need to find that both

24   factors apply.

25           THE COURT:  Let me ask you this.  Do you believe that

1    the determination with regard to her status which was made in

2    other cases is any way res judicata or collateral estoppel to

3    what I need to do here?

4         MR. SULLIVAN:  I do not, Your Honor.  But I think it is

5    certainly persuasive.  On two separate occasions, one in which

6    she admitted it herself, she acknowledged that she was a high

7    level decisionmaker and held a sensitive position.  And I think

8    it's supported by the evidence.

9         One of the things that jumped out to me with the

10   voluminous set of exhibits is that emails actually reflect that

11   she was a key person in the scheme.

12        THE COURT:  Was she the final decisionmaker?

13        MR. SULLIVAN:  As far as funding, yes.  Yes.

14        THE COURT:  It's been suggested by -- and again, this

15   is give and take.  I apologize if you have a little outline that

16   you want to work from, but I like to ask questions to sort of

17   get perspective to let you have the opportunity to sort of see

18   what I'm thinking about.

19        It's been suggested by your opponent colleague that she

20   was a mid-level manager and needed authorization for anything

21   that she did.  And it's also been suggested that the

22   determinations that were made in the other cases related more

23   specifically to her conduct, and may well have forced the Court

24   to make the determination that it did with regard to her level

25   of involvement and her level of responsibility.

1          MR. SULLIVAN:  So as far as the latter point that the

2     Court just raised, I would disagree with that characterization

3     by defense counsel.  So Ms. Sturgis was involved in the first

4     bribery scheme that she pled guilty to related to Company B and

5     was related to the contract that brings us here today.

6          There is another vendor, another scheme that she also

7     pled guilty to, but with both matters and the third scheme that

8     brings us here today, in all of these matters she was a

9     contracting officer, a contract specialist; most importantly,

10    she had an unlimited contract warrant, which means she had the

11    ability to obligate the government to contracts of unlimited

12    value.  She had very limited oversight.  The reason why she was

13    targeted is because she held a key position within the

14    Broadcasting Board of Governors.

15         Counsel has made the point that she did understand the

16    technical aspects of the U.S. Air Force contract.  Even if

17    that's correct, that's not why he selected her for the bribery

18    scheme.  He selected her because she is the person that

19    controlled the purse strings.  Every contract order, every

20    modification, every significant decision that had to be

21    processed through the Broadcasting Board of Governors, she made,

22    with the exception of one thing.  There was one military

23    interdepartmental purchase request that she had to run upstairs

24    to her boss and have the boss sign.  But she was the one who

25    facilitated that.

1          THE COURT:  Other than the cases specifically involving

2     Ms. Sturgis, are there any Fourth Circuit opinions that you

3     believe analytically support your perspective in the case?

4          MR. SULLIVAN:  Yes.  We cited *Rebrook*, we cited *Conrad*,

5     we cited a number of cases in our brief that we think are -

6     *Matzkin* was a naval engineer - that we do think are on point.

7     In those situations, what the Court, particularly when focusing

8     on sensitive position, looked at with contracting officers and

9     individuals like that is, do they control the purse strings; do

10    their decisions affect the public fisc.

11          She's in a sensitive position because she has an

12    unlimited warrant.  She awarded over $30 million to Company B

13    through this contract vehicle with the Broadcasting Board of

14    Governors.  She had substantive responsibilities within the

15    Broadcasting Board of Governors, she had very limited oversight,

16    she had a great deal of autonomy.  The reason why she was

17    selected for the bribery scheme is precisely because of that,

18    because she could keep the gravy train moving, keep the conveyor

19    belt moving with limited oversight and with no one meddling.

20    That's why the defendant selected her.

21          THE COURT:  With regard to the determination that the

22    Court needs to make, I'm assuming that you agree that the

23    government bears the burden of persuasion.  But by what quantum

24    of proof?

25          MR. SULLIVAN:  For sentencing, I think it would be a

1    preponderance level, Your Honor.

2            THE COURT:  Okay.  Thank you.

3            MR. SULLIVAN:  Thank you.

4            MR. PEASE:  Your Honor, the facts in this case are very

5    clear, and we've provided the Court with extensive evidence to

6    support them.  Diane Sturgis -- this is kind of a unique

7    situation.  Diane Sturgis worked for the Broadcasting Board of

8    Governors, which is a component of the Department of State.  The

9    U.S. Air Force funded these contracts, controlled these

10   contracts, made all decisions relating to these contracts.

11   There was a blanket purchase agreement vehicle in place already

12   between BBG and Company B, and that was the vehicle that was

13   used for the Air Force to be able to have these services

14   provided.

15           The decisionmakers in this case were the

16   United States Air Force and its contracting officer's technical

17   representative.  The evidence is very clear.  Diane Sturgis had

18   no authority whatsoever on any key decision.  She made

19   no decision about --

20           THE COURT:  The comment by your opponent colleague,

21   Mr. Sullivan, is that Ms. Sturgis, as he said, controlled the

22   purse strings.

23           MR. PEASE:  She did not control any purse strings,

24   Your Honor.  There were no decisions -- those purse strings were

25   controlled by the United States Air Force.  These contracts were

1    funded by the United States Air Force.  The United States

2    Air Force decided what the work would be, what the project and

3    scope of work would look like.  The United States Air Force

4    managed and oversaw and supervised the work.

5          The emails are very clear.  Diane Sturgis was

6    responsible to ensure all the necessary paperwork to process --

7    that the invoices that came through got to the right place, and

8    when there were contract modifications, it was her

9    responsibility to pass them forward.  The CFO of BBG is the one

10   who made decisions about the approval and keeping the process

11   moving.

12         She had no decision-making authority at all.  She

13   literally served as a scrivener, or as a clerk.  She made no

14   decisions about the amount of the funding, she made no decisions

15   about the substance or scope of the work, she had no supervision

16   at all over the actual work itself that was being performed on

17   behalf of the Air Force.  She didn't supervise Company B or any

18   of the work that Company B was doing, which isn't surprising,

19   because she didn't have the background.  These are highly

20   classified intelligence programs that the Air Force involved

21   very specialized work, of which --

22         THE COURT:  What I believe Mr. Sullivan would suggest

23   is that while she made not have had the technical expertise to

24   essentially manage the contract, she was the one who was

25   controlling the money.

1          MR. PEASE:  She didn't control any money, Your Honor.

2     No payments or invoices were approved in this case until the

3     Air Force signed off on them.  Okay?  She was -- she ultimately

4     had to put her signature on numerous documents.  There's no

5     question about that.  But she had no discretion, she had no

6     authority to say no.  If the paperwork was in order, and that

7     was one of the things that Mr. Sotomayor would help with, and

8     met with the United States Air Force's requirements, then it was

9     approved and she signed it and moved things forward.

10          What are some of the things that she did?  She signed

11    contract mods only after they were initiated and approved by the

12    United States Air Force.  She admitted in her interviews, in the

13    discovery materials, which we made an exhibit, she had no

14    control over contract modifications.  She signed invoices only

15    after the Air Force representative validated and accepted the

16    work for every invoice period.  She signed military

17    interdepartmental purchase requests only after the CFO of BBG

18    signed off on them.

19          THE COURT:  Counsel, I know you're being very thorough,

20    and I'm going to ask you a question.  If you don't know the

21    answer, I appreciate that.  I'm sure you looked at the cases

22    that were cited by Mr. Sullivan, particularly the cases

23    specifically involving Ms. Sturgis.  What do you believe were

24    the drivers in those cases which made her qualify under the

25    standard that you now not want her to qualify under?

1          MR. PEASE:  You're referring to the cases in which she

2    pled guilty?

3          THE COURT:  Yes.

4          MR. PEASE:  In those two cases, what happened is, those

5    contractors put her daughter on the payroll.  She had -- she was

6    directly involved in that.  She had those contractors put her

7    daughter on the payroll to do little or no work at all, and her

8    daughter got paid.

9          THE COURT:  What is the difference between that and the

10   straw persons that are alleged to have been used in these cases?

11         MR. PEASE:  I'm sorry, I didn't hear your question.

12         THE COURT:  What is the difference between her daughter

13   being used in those cases and the straw persons being used in

14   this cases, as suggested by the government.

15         MR. PEASE:  Well, in both cases there was an improper

16   financial benefit that she received.  There's no question about

17   that.  But the fact that she was willing to accept that

18   enhancement without challenging it, it has no persuasive

19   authority here.

20         If you look -- you need to look at the specific facts

21   and circumstances on this particular case and in this particular

22   contract.  We're not talking about a situation where it was her

23   daughter being put on the payroll.  These are contracts

24   involving services provided by a contractor to the Air Force,

25   where her only role is to move paperwork forward.

1          In fact, if you look at some of the emails - in fact

2     Exhibit 27 is one of the most, I think, significant documents.

3     If you look at it, the Air Force raised a question about whether

4     she actually even existed.  If you look at that email, it says,

5     "It's nice to know she exists sometimes.  Maybe she would return

6     a phone call sometimes."

7          So yes, was she important to the process?  Of course.

8     She or someone else in her position, someone had to sign off on

9     this paperwork because it was her agency administering the

10    contract.  There's no dispute about that.  But this work was not

11    being done for her agency.  She wasn't managing it, supervising

12    it.  She had nothing to do with it, other than to make sure the

13    right paperwork got to the right people, and that the invoices,

14    once the Air Force approved them, got paid.  That is not --

15         THE COURT:  I'm going to ask you the same question that

16    I asked Mr. Sullivan.  You would agree that the burden of

17    persuasion is with the government with regard to this particular

18    issue?

19         MR. PEASE:  It most certainly is, Your Honor.

20         THE COURT:  And you would also agree that the standard

21    is by a preponderance of the evidence?

22         MR. PEASE:  I would.

23         THE COURT:  Thank you, sir.

24         MR. PEASE:  If I may, Your Honor, just the *Weston* case,

25    which is a Fourth Circuit unpublished decision, it's compelling.

1    In that case we had a naval public works official with

2    contracting authority, more authority than Diane Sturgis had,

3    and more directly involved in these contracts, and the Court

4    found it wasn't enough.  And it relied on the *Stephenson* case,

5    which is the Second Circuit case, which is compelling.

6        I think if you look at those cases, Your Honor, and if

7    you examine the specific facts here -- I'm not saying

8    Diane Sturgis could never be a high level decisionmaker or could

9    never be someone in a sensitive position, but in this particular

10   case --

11       THE COURT:  But you're suggesting that in this case

12   it's fact generated; in other words, the specific and particular

13   facts related to this case do not allow her to qualify as that

14   particular individual in this particular case.

15       MR. PEASE:  That's correct, Your Honor.

16       THE COURT:  I think I understand your argument.  What

17   the Court is going to do is take the matter under advisement in

18   the sentencing disposition.  So now we can switch to sentencing.

19       The concern that I have, Mr. Sullivan - and I'm sure

20   that you share this concern with regard to Mr. Sotomayor - is

21   that there's some balance that we need to strike here.

22   Obviously this gentleman has served our country very well for

23   several years, and has been a person who is almost an American

24   success story when it comes to it; coming from a foreign

25   country, managing to make his way up through the educational

27

1    ranks, graduating from college, serving our nation with

2    authority.  And then sort of gets caught up in some scheme where

3    it's absolutely corrupt.

4            And has managed to generate a very good largesse for

5    his family.  I think I read somewhere that he had an over

6    $3 million net worth.  And it's just concerning, because from my

7    perspective, one could suggest that this is just a person who,

8    for whatever reason, has become greedy; managed to accumulate

9    $3 million in wealth, able to do a lot of things that people

10   dream about being able to do to help his family and others, and

11   engaged himself in something that is just pathetic, quite

12   frankly.

13           MR. SULLIVAN:  Your Honor, we would concur and

14   recognize -- so the defendant has had a distinguished military

15   career, and nobody is here to say otherwise.  We recognize it,

16   we appreciate the service.  But you can't have it both ways.  If

17   his military service was completely divorced from the corruption

18   and bribery schemes that we're talking about here today, then it

19   might be a different argument.  But it's not.  They're

20   intertwined.

21           He left the service around 2010.  He immediately opened

22   up consulting companies and he traded on his contacts and

23   relationships with these same individuals that he had been

24   working with for years in the U.S. Air Force, in the Pentagon in

25   Arlington.

1          You can't wrap yourself in the same flag that you

2    dishonored.  He acted without integrity, he was dishonest in

3    running -- and it's not just this one scheme.  As you can see

4    from the other relevant contract, it's other schemes.  Every

5    contract that he touched was tainted by either corruption,

6    fraud, or both.

7          We pointed this out to defense counsel pre-indictment.

8    I've done a number of these procurement fraud cases, and,

9    candidly, I was taken aback by their position when they

10   recommended probation, because this is one of the worst

11   procurement fraudsters that I've had before the Court for

12   sentencing.

13         We believe that the request for probation is both

14   inappropriate and unjustified.  He greased the skids to get

15   nearly all of his corrupt military contracts.  He constantly

16   looked to take shortcuts, and we respectfully submit that he's

17   now trying to take additional shortcuts to get out of prison

18   time.

19         The fact that he has prepaid his financial penalties is

20   commendable.  It is also commendable that after indictment and

21   after we provided extensive discovery, that he eventually

22   accepted responsibility for his crime.  However, the fact that

23   the defendant can afford to pay a substantial amount of

24   financial penalties up front, and may be doing so, candidly,

25   with the spoils of his criminal activity, should not allow him

1    to buy his way into a noncustodial sentence.  Otherwise, this

2    will truly be a situation where crime does pay.

3         We respectfully ask the Court to send a strong

4    deterrent message and imprison him for 37 months.

5         Your Honor, I'm happy to go through the 3553(a)

6    factors, but if the Court has specific questions, I'll

7    streamline it.  What I would like to note, though, is, we gave a

8    lot of thought to our recommendation of 37 months.  We thought

9    about the 3553(a) factors, the sentencing guidelines, the

10   totality of the circumstances.

11        Importantly, our recommendation tried to take into

12   account the significant benefits that we've already afforded to

13   the defendant post-indictment.  There's no need to give an

14   additional variance or departure here.  Why?  We agreed to

15   structure the plea around Count I, the conspiracy count, which

16   capped his liability at 60 months.  We used a loss amount that

17   was focused on the bribe payments, $150,000 given to

18   Ms. Sturgis.  One dollar more, by the way, and it would have

19   been 10 levels instead of 8 levels.

20        We agreed to compromise on restitution and forfeiture

21   because he expressed a willingness to pay those financial

22   penalties up front.  We agreed not to seek a fine.  We have

23   requested a guideline change due to a sealed filing.  We ask the

24   Court now to grant the motion that we filed under seal.  And we

25   have recommended the low end of the guideline range.  37 months

1    should be the floor, not the starting point to vary downward.

2           Your Honor, we address his age and health-related

3    issues in our brief.  If the Court has questions, we can follow

4    up there.  Just simply put, he has a number of conditions that

5    are relatively normal for a man of his age, and there's no

6    indication that the Bureau of Prisons cannot address those.  He

7    would likely be a Care Level 1 inmate if he were sentenced to

8    prison.

9           Counsel has brought up continuously in our plea

10   negotiations that there was contract performance here.  And that

11   is irrelevant, as we noted in our brief.  The fact that there

12   was contract performance doesn't avoid the critical point, which

13   is, the contract would not have been awarded in the first

14   instance but for the fraud and corruption.  So this is void

15   *ab initio* on the civil side, void from inception.  It never

16   would have been granted, it would not have been sole sourced to

17   Company B but for the fact that the bribery scheme occurred.

18          Lastly, there's a discussion in our brief about

19   downward variances based on sentencing disparities with Sturgis.

20   Her second sentence was 30 months, her first sentence was

21   24 months.  They ran concurrently, so essentially a 30-month

22   sentence.  Those were smaller bribe schemes.  We were not quite

23   there yet on discovery in the scheme involving Sotomayor.  She

24   was the one that brought it to our full attention.  She did

25   cooperate and she did provide substantial assistance in those

1    matters.

2            Counsel has also brought up the fact that one of her

3    schemes involved a different vendor, two other co-conspirators

4    that were related to the other vendor.  Very different facts and

5    circumstances, including one individual who was a cooperator in

6    that case, so they were sentenced to a term of imprisonment, but

7    it was below what the government recommended.

8            Your Honor, just to wrap up, we respectfully submit

9    that this is not a probation case, and it's not a probation case

10    by a long shot.  Again, this is one of the more egregious

11    procurement fraud matters that I've been involved with.  His

12    sentence should reflect the seriousness of his conduct.

13    Respectfully, we ask for 37 months.  Thank you.

14            THE COURT:  Thank you, counsel.  Well presented.

15            MR. PEASE:  Your Honor, there is one other objection to

16    the presentence investigation report that we had noted.  The

17    government and the defense agreed on this one.  And that is that

18    the $150,000 agreed to in the plea agreement should be used to

19    increase the guidelines by eight rather than the 12, which --

20            THE COURT:  Do you concur, Mr. Sullivan?

21            MR. SULLIVAN:  Yes, Your Honor.

22            THE COURT:  Very good.  Thank you.

23            MR. PEASE:  Your Honor, we certainly agree, there's no

24    doubt this is very serious, very egregious case.  It's a case

25    which I've struggled to understand, given the defendant's

1       background and his history in this case.  The sentencing of any

2       individual, and particularly this individual, takes into account

3       more than the offense conduct itself.  There are many other

4       factors that are important here for the Court to consider.

5              The first starting point, certainly, is acceptance of

6       responsibility and remorse and shame.  And you'll hear from my

7       client more on those subjects.  He is a 65-year-old man, a

8       service-disabled veteran, with not just an impressive 30-year

9       career in the military, it's an extraordinary military career,

10      one where a life devoted to service, where he literally has been

11      flying planes while being shot at.  He put his life on the line.

12             He's been deployed to a dozen countries around the

13      world to fight terrorists --

14             THE COURT:  Which arguably makes his case more

15      problematic and troubling.  I'm trying to work my way through

16      how a person who could serve in such a distinguished manner

17      could just get himself involved in a multilevel bribery and

18      corruption scheme.  It's almost inconsistent with the values

19      that he would have as a military officer.

20             MR. PEASE:  Right.  I'm highlighting and relating to

21      the military service, Your Honor, because we have a motion for a

22      downward departure based on military service under 5H1.11.  I've

23      read every federal District Court and appellate court decision

24      that addresses this issue; there is not a case anywhere in

25      America where the facts are stronger than this case that would

1    support a downward departure based on military service.  The

2    Supreme Court, the sentencing guidelines, and many courts have

3    found that military service is a factor that the Court should

4    consider very seriously, and it's a basis for a downward

5    departure.

6         So in addition to the cooperation departure motion the

7    government has filed, we also ask the Court to depart downward

8    under 5H1.11, based on a truly extraordinary record.

9         And I'm sure Your Honor has read our submission, and we

10   attached many documents relating to his military career.  I

11   mean, this man was responsible for completely reconfiguring the

12   B-52 bomber - that's one of the defining legacies of his

13   career - which has been used by the Air Force in

14   Operation Desert Storm and the global war on terror.

15        He didn't sit behind a desk, he put his life on the

16   line.  And, as a result of that, he has debilitating permanent

17   injuries.  Which Mr. Sullivan may pass them off as common to a

18   65-year-old; there's nothing common about this 65-year-old man.

19   3,000 hours in a B-52, a bomber pilot flying while being shot,

20   landing on runways in Afghanistan, jumping off the plane onto

21   the tarmac while the plane goes and backs and takes off at

22   night.

23        I could talk for hours about the service this

24   individual has paid to our nation.  It's a nation he embraced as

25   an immigrant.  And, as you mentioned, put himself through

1    college, was not under the best of family circumstances, and

2    made a career not just of serving our country, but of leading

3    our country.

4         And these performance reports and the numerous medals,

5    including the Legion of Merit --

6         THE COURT:  Which is the highest level of service medal

7    that he can get with his rank.  I'm aware of that.

8         MR. PEASE:  So, Your Honor, I want to talk about the

9    point you raised, because I've struggled with it as well.  And I

10   understand the Court's position.  But I guess what I'm trying to

11   say is, the military service record, it's significant, it

12   justifies a downward departure in addition to a variance.

13        His health is very serious.  I mean, he is in constant

14   pain; his legs, his back condition.  He had a heart attack in

15   2019.  His heart condition has worsened, his blood pressure

16   medication has been increased.  He's at the risk -- five times

17   greater risk of stroke.  He just had a colonoscopy last week

18   where they removed a polyp from his colon.  His father died of

19   colon cancer.  They're waiting the results of a biopsy on that

20   to see if he has colon cancer.

21        So his health conditions are extremely serious, and all

22   through this he's been helping to support his family and his

23   wife, who has also serious medical conditions.

24        But does he get it?  You're going to hear from him in a

25   few minutes.  Mr. Sotomayor gets it.  He made a horrific

1    mistake.  He has been ostracized by the military community which

2    he made a life serving.  He is a pariah in that community.  His

3    reputation has been destroyed, completely tarnished.  He is

4    ashamed of himself and he has let down his family and everyone

5    else who knows him.

6         No matter what sentence the Court imposes, the

7    indignity and the shame from the mistakes he made when he left

8    the military are something he will have to live with the rest of

9    his life, something that he thinks about every day.  And the

10   family that he was a part of for 30 years is gone.  It has

11   disappeared and it will never come back to him.

12        He is someone who has taken responsibility his entire

13   life for helping his family, but not just his immediate family,

14   extended family.  You heard from his son who talked about a few

15   examples.  He was a little bit nervous when he was testifying.

16   There's a lot more he could have said.  But this man has taken

17   everyone he possibly can under his wing during his entire life.

18   He has supported people, even strangers, and provided them with

19   financial support whenever possible, not just when he got out of

20   the Air Force, when he had more money, but when he was in the

21   Air Force.

22        He not only served his country, he deployed to Japan

23   when there was a tsunami.  He deployed to New Orleans for

24   Katrina.  He was the first there.  He led the U.S. response

25   efforts in imagery and satellite imaging to help first

1    responders on the ground.

2        Every time there has been a crisis, he has been the

3    first out the door.  And those performance reports speak volumes

4    that the generals who know him, who have commented on his

5    service, talk about him.  He put his life at risk for 30 years,

6    put himself above everyone else -- put everyone else above

7    himself.  He is an extraordinary man.  He lost his way.  He left

8    the military after a lifetime of being in government service,

9    and certainly wanted to make a living, and he went about it,

10   obviously, the wrong way.

11       I don't agree with Mr. Sullivan that these contracts

12   wouldn't have been awarded but for him paying Diane Sturgis.

13   The contract had been awarded.  The payments came later.  So it

14   doesn't change the fact that what he did was wrong and shameful,

15   and I'm not in any way excusing it.

16       And certainly it's no defense that Company B, under his

17   guidance and with his help, performed, not just did the work

18   they were paid to do, but did it exceptionally.  The government

19   got much more than what it paid for.  Again, it's not an excuse.

20   It doesn't change what he did, it doesn't make it right.  But

21   it's certainly a factor in considering the nature and

22   circumstances of the offense conduct that the Court can and

23   should consider here.

24       He's a first time offender, 65-year-old man, and

25   30 percent disabled veteran.  Prison is going to be extremely

1    hard on him physically, emotionally.  He has so many serious

2    health issues.  Yes, I'm not contesting that the

3    Bureau of Prisons can't -- it would be impossible to take care

4    of those conditions.  But prison is going to be much harder and

5    much more difficult for Mr. Sotomayor than it would be for

6    someone else.

7         THE COURT:  The question, and obviously one of the

8    3553(a) factors that we have to consider - not necessarily the

9    preeminent factor, but a factor - is, how is this going to --

10   and I'm paraphrasing this.  How is this going to be perceived by

11   the public at large?

12        In other words, we have this distinguished military

13   individual who has served his country well, who is sick, but

14   engaged in a public bribery and corruption scheme, who

15   essentially does not have to pay the price of going to

16   incarceration like most other individuals would have to in a

17   case such as this.  How do we find that balance that we must

18   strike?

19        Again, we're going to give him credit for what he's

20   done.  That's easy for me.  What's hard for me is the

21   responsibility I have to make sure that the appropriate message

22   has been sent that, notwithstanding what you may have done for

23   this country, you still have to live by the rules.  And the

24   rules require that you not engage in a scheme such as this.

25        MR. PEASE:  Understood, Your Honor.  Well, there are

1    two components to the answer to your question.  The first,

2    obviously, is specific deterrence.  And I submit to you that

3    there is no chance this man is going to be a recidivist.  You

4    know, if you look at the sentencing commission statistics we

5    cited, for individuals his age, first time offenders, he will

6    not.  He has learned his lesson.  He is not going to offend

7    again.  He's not going to have the opportunity to.  His life is

8    over.  His reputation has been destroyed.  He is left to try to

9    pick up the pieces.

10         And the main and most important thing he had besides

11   his family was his reputation, was his standing in the military

12   community.  He was a senior decorated officer, not just some

13   individual who served in the military.  He was recognized,

14   Congressional medals from Hawaii and Palmetto, the Legion of

15   Merit.  He is known around the world.  The French ambassador

16   wrote a letter about how he restored French-American

17   cooperation.

18         There are so many stories of his legacy.  Those

19   memories, the sacrifices he made, being deployed dozens of times

20   away from his family, that was his life.  That was everything to

21   him.  And it's gone.  It's been destroyed.

22         And so when we talk about general deterrence, certainly

23   jail time sends a message.  And I cited some of the studies in

24   our brief about white collar offenders.  The question is, how

25   harsh does the penalty need to be, and shouldn't we also

1    consider the impact of the sentence in other ways, and how it

2    impacts the life of individuals.

3           And in these sorts of cases, there's no evidence to

4    support the idea that more prison time means more deterrence.

5    If anyone were to look at him, a 65-year-old decorated war hero,

6    combat veteran, serious health issues, in the waning days of his

7    life, okay, with a heart attack, he's at risk of stroke at any

8    moment, and waiting to see if he has cancer, no one would look

9    at him, as disgraced and dishonored as he is, receiving a

10   sentence of probation, home confinement, community service, any

11   other conditions the Court could think of, no one will look at

12   that sentence and say, this man got off easy, he got a break

13   that other people should have gotten.

14          In fact, if you look at the last exhibit in our binder,

15   Exhibit 48, the sentencing commission has looked at bribery

16   cases, and in 78 percent of them, the Court varied downward and

17   like 58 percent of the sentence was reduced.  So it's common in

18   bribery cases to grant downward variances, significant downward

19   variances, for a variety of reasons.

20          Mr. Sotomayor is much older than the average bribery

21   defendant, his health conditions are far worse, and there's

22   never been a defendant in a federal courtroom in this country

23   with the service record that this man has had facing a case like

24   this.

25          So I understand completely.  I was a federal prosecutor

1    for 16 years, Your Honor, and I stood in Mr. Sullivan's place in

2    bribery and public corruption cases.  I've never seen one like

3    this.  This case keeps me up at night.  I don't have a good

4    explanation for you, other than he lost his way.  In his zeal to

5    try to provide support to his family, he crossed the line.  He

6    made terrible mistakes, he did things that are criminal, and he

7    fully accepts responsibility for it.  He fully accepts it,

8    Your Honor.

9          So I beg you to consider a sentence that will allow him

10   to remain with his family and give him time.  He still has much

11   more to contribute to our society, and warehousing him in a

12   federal prison, Your Honor, is not necessary to send a message

13   of general deterrence, I respectfully submit to you.

14         THE COURT:  Thank you, counsel.

15         Mr. Sotomayor, is there anything you want to say to the

16   Court before the Court imposes sentence in this matter?

17         THE DEFENDANT:  Yes, sir.  With your permission, I

18   wanted to get it right, so I took some notes.  If I could read

19   those.

20         THE COURT:  Yes, sir.

21         THE DEFENDANT:  And I apologize for my nervousness.

22   I'll try to read.

23         So, dear sir, I stand before you, head bowed, totally

24   drenched in shame.  I'm totally covered in dishonor.  I am

25   unable to find words sufficient to express my sorrow or the

1    profound remorse that I feel.

2         Approximately 10 years ago I made a series of dreadful

3    mistakes.  I failed to think these things through.  I failed.

4    My desire to succeed in my post-retirement business efforts

5    clouded my judgment.  I lost my way, despite a lifetime of

6    service and honor that I pursued until that point.  It was my

7    decision, no one else's.  I offer no excuses.  It was my

8    mistake, I own it.  I assume full responsibility for my

9    failures, for my actions.  They are mine.

10        I recognize and acknowledge that what I did was more

11   than wrong, it was shameful.  And I sincerely apologize to the

12   Court and to those impacted by my actions, to my beloved

13   Air Force, the Broadcast Board of Governors, to my colleagues.

14   As a result, I have caused great pain and hurt to those who are

15   most dear to me.

16        This is especially true regarding my bride of 25 years.

17   She has done nothing but care, love, and support me throughout

18   my life.  She is the rock of my existence.  To my son, who I

19   tried to raise as a solid citizen, who looks up to me, I failed

20   him.  To my family, my band of brothers, I have failed them.  I

21   have failed myself.

22        I cannot say how much I am sorry, or cry enough - and I

23   have a lot lately - for the hurt that I am the cause of.  I'm

24   sorry.  (Speaking Spanish.)  In Spanish I said, I'm sorry, my

25   love, for the pain I've caused you.  Son, forgive me.  I say

1    that to all.

2         I also failed the nation that I served for 30 years

3    through my actions that have brought me here today before you,

4    sir.  My actions have brought dishonor to myself and to my

5    nation, a nation I love and fought for and protected my entire

6    life, and would do so again.

7         I deeply regret and am ashamed of my actions which

8    corrupted a contracting process, and would do anything possible

9    to change this past and the poor decisions, if I could.  But I

10   know I cannot.  I only have faith and dedicate myself to improve

11   our future as best I can, with all the abilities the good lord

12   has blessed me with.

13        At a time in a life when a man should be settling down

14   with his grandma bride, this beautiful lady, we should be

15   cuddled, remembering a life together, over a fire, maybe hot

16   chocolate.  Instead, I've caused her unnecessary and inexcusable

17   tears, grief, confusion, and pain.  She trusted me.  I failed

18   her.  I had no right to do this.

19        I will go to my grave with this taint on my soul.  Not

20   a day will go by that I am not aware.  I've always strived to

21   leave my children, and now my grandbabies, a clean, honest name,

22   one they could be proud of and carry forward with honor.  My

23   mother and father gave me that name with high hopes from a life

24   of their sacrifice.  My dad passed away a few years ago; my mom

25   will be 87 this Saturday.  She has very few years left in her.

1    I recognize how I failed them all.  I can only pray for a chance

2    to atone to all of them with every day that I have remaining.

3           My mistakes were and are deeper than I could have

4    imagined, and so much more painful than I realized.  I know

5    there are no do-overs, and I accept the consequences of my

6    action.  I can only pray and ask the Court for mercy, a last

7    chance to try to make things right, an opportunity to care for

8    them, to be there for them, to help them as I can until my own

9    end.

10          I faithfully served my nation 30 years without fail,

11   and I can only hope to dedicate my remaining time on earth to

12   serve my family, to care for my bride during these difficult

13   times to come, to love and cherish her even more than I can

14   today; to care for her medical and emotional needs that are

15   degrading; to be able to put a blanket on her at night so she

16   cannot get cold.  To comfort her in our sunset years, to be

17   there for our children, to help guide them, see them grow as

18   good parents, help build them, help face them -- help them face

19   the challenges of these difficult times coming.

20          To be there for my grandbabies, to help them be good,

21   happy kids, be good citizens of our nation, and prove

22   themselves, maybe spoil them a little bit on occasion.  Perhaps

23   along the way I can recover the shame and loss of dignity in

24   their eyes.

25          I thank you, sir.  Thank you, Your Honor, for

1    considering what I have said today and all the circumstances

2    that the Court will take into account in determining a just

3    penalty for my failure and my actions.  Please, please know that

4    I sincerely apologize for what I have done, and will continue to

5    do everything possible in an attempt to right the wrongs that I

6    have done.  For this has been a once-in-a-lifetime hard error in

7    my judgment that I completely regret.  I have learned a great,

8    great deal.  I have grown from this experience.  I know I'll

9    have much, much more to give.  I know I can contribute much to

10   my family and society in this lifetime.  I pray for a second

11   chance to provide that, to prove it, to so do it.

12            With deepest sincerity, I thank you for your time.

13            THE COURT:  I need to ask you one question.

14            THE DEFENDANT:  Sir.

15            THE COURT:  I have to work my way through this, and

16   it's a hard decision.  And one of the things that I do is I

17   observe everything that's going on in the courtroom.  And I can

18   tell, next to your wife and your son, the person who is most

19   troubled by this is your own counsel.  He is just overwhelmed by

20   the circumstance that you're facing, and he has essentially

21   placed himself in your shoes, and the grief that he shares as to

22   what I may do in the context of this case.

23            But I need to ask this question.  As a person who has

24   served our country so well -- and I compliment you on that, and

25   I want to let you know I appreciate that.  I come from a

1    military family also.  My brother served as a lieutenant colonel

2    in the Army for 30 years; never made colonel.  He didn't get the

3    Legion of Merit.  He got the one next to the Legion of Merit,

4    and was disappointed that he didn't get the Legion of Merit.

5         My son-in-law was deployed seven times as an F-18

6    fighter pilot during the many conflicts that we had in the

7    Middle East, and I'm very proud of him.  He graduated from -- he

8    served in the United States Navy for a number of years, and now

9    he flies for a commercial airline.  Very proud of him.

10        But the question I have for you, sir, is, you're a

11   bright man, no question about it.  So much to offer.  What was

12   going through your mind when you knew that you were doing

13   something that was just flat wrong?  Not assessing the elements

14   of criminal liability, but I have got to imagine that in your

15   heart you knew it was wrong.  Why did you do it?

16        THE DEFENDANT:  I lost my way, sir.  I became

17   over-enthused at trying to succeed.  I didn't think it through

18   clearly.  My fault, like I said.  Everything had been organized

19   and done and started, and I got wrapped up in a moment.  I

20   didn't think it through.  It's a failure, my own.

21        I lost my way that day in the hopes that I would try to

22   do something better and longer, and it was just flat out wrong.

23   I failed to consider all the options, something I should have

24   done.

25        THE COURT:  All right, sir.  Thank you.

1          THE DEFENDANT:  Thank you, sir.

2          THE COURT:  All right.  Mr. Sotomayor, you may remain

3     seated while the Court imposes sentence.  The dispositional

4     aspect of it is pretty long, and I don't want him on his feet

5     for all that time.

6          All right.  In reaching the sentencing disposition in

7     this case, the Court has made the determination, despite the

8     evidence presented by the government, but the Court is going to

9     decline to apply the four-level increase for the involvement of

10    a public official in a high level decision-making or sensitive

11    position under Section 2C1.1B3, because whether Sturgis

12    qualifies as such an official is a relatively close call.

13         I'm going to grant the defendant's motion for a

14    downward departure and variance due to his distinguished

15    military service, age, health, and family situation, but the

16    sentence the Court is going to impose must send a strong

17    deterrent message to the public that bribery is a serious crime

18    that carries serious consequences.

19         Under the sentencing guidelines, the base offense level

20    is 12.  Because the offense involved more than one bribe or

21    extortion, the offense level is increased by two levels under

22    statute.  The Court finds that the probation officer properly

23    found that a 12-level increase is warranted because of the value

24    of the payment, the benefit received or to be received in return

25    for the payment, the value of anything obtained or to be

1    obtained by a public official or others acting with a public

2    official, or the loss to the government from the offense which

3    is greater exceeded $250,000.  However, the Court takes into

4    consideration that pursuant to the plea agreement, the parties

5    stipulated to an eight-level loss amount.

6            As indicated earlier, the defendant objects to the

7    probation office's application of a four-level increase for the

8    involvement of a public official.  But, as the Court has

9    determined, in this context and the facts presented in this

10   case, that four-level increase would not be appropriate.  The

11   sentencing guideline commentary defines a high level

12   decision-making or a sensitive position as, quote, "A position

13   characterized by a direct authority to make decisions for or on

14   behalf of a government, department, agency, or other

15   governmental entity, or by substantial influence over the

16   decision-making process."

17           According to case law, positions to which the

18   adjustment has been applied have additional hallmarks of

19   authority.  These hallmarks include supervisory authority over

20   other employees, the authority to make public policy, the

21   ability to stand in the shoes of a policymaker, or the ability

22   to influence policymakers.  A sister jurisdiction, the

23   Fifth Circuit, has also found that the existence of discretion

24   involving final decision-making authority over matters of public

25   policy or over the expenditures of substantial sums of money to

1    be an important mark of high level responsibility.

2         Here, Ms. Sturgis does not appear to have had final

3    decision-making authority over the money issued under the

4    guidelines of the contract.  Rather, Ms. Sturgis' actions were

5    subject to review and approval, not only by her direct

6    supervisors at the BBG, but also from the United States

7    Air Force.  At bottom on Ms. Sturgis' position, the latter has

8    some degree of discretion.  It does not set her apart from any

9    other contracting officers who worked for the government.

10        That was recognized in the *Weston* case of the

11   Fourth Circuit.  According to *Weston*, it is apparent that any

12   official to whom a gratuity may be offered or given will have

13   some authority, or apparent authority, to make decisions that

14   will affect the public financial circumstances.  That fact

15   alone, however, cannot distinguish such an official from a

16   multitude of other personnel in the federal service.

17        Because defendant has clearly demonstrated

18   responsibility for the offense, the offense level is decreased

19   by two levels under statute.  And because defendant has assisted

20   authorities in the investigation and prosecution of his own

21   misconduct by timely notifying authorities of his intention to

22   enter a plea of guilty, once again, the offense level is

23   decreased by one additional level.

24        Therefore, the defendant's total offense level is 23.

25   The Court recognizes, however, that the parties stipulated to an

1    eight-level loss amount, which results in a total offense level

2    of 19.  The criminal history score is 0 and the criminal history

3    category is I.  Accordingly, the applicable guideline range in

4    this case is 46 to 57 months imprisonment.  Again, however, the

5    Court considers that the parties stipulated to an eight-level

6    loss amount, which results in a guideline range of 30 to

7    37 months imprisonment.  The supervised release term under the

8    guidelines is one to three years, the fine range is 25,000 to

9    $670,000.

10           Pursuant to 18 U.S.C. 3553, the Court should consider

11   the following:  One, the nature and circumstances of the offense

12   and the history and characteristics of the defendant; two, the

13   need for the sentence imposed to, among other things, reflect

14   the seriousness of the offense and adequately deter criminal

15   conduct; three, the kinds of sentences available; four, the

16   guidelines; five, policy statements issued by the sentencing

17   commission; six, the need to avoid unwarranted sentencing

18   disparities among defendants with similar records found guilty

19   of similar conduct; and, finally, the need to provide

20   restitution to the victims of the offense.  Ultimately, under

21   the *Booker* standard, the sentence must meet a standard of

22   reasonableness.

23           The Court first considers the government's sealed

24   motion pursuant to statutes.  For reasons stated in the

25   government's sealed motion, the Court finds that a decrease in

1    the sentence is appropriate in this case and will grant the

2    sealed motion.

3          The Court next turns to defendant's motion for downward

4    departure and variance. The Court finds the defendant's case

5    presents several mitigating factors under the specific statute;

6    specifically, his exceptional military service, his age and poor

7    health, and his family circumstances.  Accordingly, the Court

8    will grant the defendant's motion and impose a slightly

9    below-sentencing-guidelines sentence.

10          With respect to the 3553(a) factors, with respect to

11   the history and characteristics of the defendant, the Court has

12   carefully considered defendant's specific circumstances,

13   including his outstanding and commendable military service, his

14   age, his poor health, and his family situation.  The Court also

15   recognizes that the defendant has expressed clear remorse and

16   accepted responsibility for his role in the offense.

17          The Court additionally considers that the defendant has

18   already paid the full amount of restitution to be ordered in

19   this case.

20          And as for the nature and circumstances of the offense,

21   it is unfortunate that the defendant used his skills and

22   knowledge he acquired through his 30-year military service to

23   defraud the country he once honorably served.

24          The Court next considers the need for the sentence

25   imposed to reflect the seriousness of the offense, to promote

1    respect for the law, and to provide just punishment for the

2    offense, to afford adequate deterrence to criminal conduct, to

3    protect the public from further crimes of the defendant, and to

4    provide the defendant with the needed educational or vocational

5    training, medical care, or other correctional treatment in the

6    most effective manner.

7          It has been stated and everyone agrees that bribing a

8    government official is a very serious offense.  The defendant's

9    corrupt behavior and payments to Ms. Sturgis in the instant case

10   breached the trust bestowed upon her, and the Court must impose

11   a sentence that is significant enough to convey to the defendant

12   and others that bribery is a serious crime that is not worth the

13   risk.

14         The guideline range for this case, again, is 46 to

15   57 months.  However, the Court will take into account the

16   parties' stipulation to an eight-level loss amount, which

17   results in a guideline range of 30 to 37 months.

18         In this instance, the Court's sentence will not create

19   unwarranted sentencing disparities.  That is, it is commensurate

20   with sentences received in other cases and involving similar

21   schemes.  The defendant's sentence will include court-ordered

22   restitution, which will provide compensation, to some extent, to

23   the government agency that he defrauded.  In this court's view,

24   30 months incarceration to be accomplished by a six-month prison

25   sentence and a home confinement of 24 months accomplishes that

1    objective.

2         As indicated, the defendant shall pay $405,000 in

3    restitution to the Broadcasting Board of Directors, now known as

4    the United States Agency For Global Media.  The Court imposes a

5    three-year period of supervised release.  During his period of

6    supervision, the defendant must comply with the standard

7    conditions that have been adopted by this court, as well as the

8    following special conditions:

9         Defendant shall apply all monies received from income

10   tax refunds, lottery winnings, inheritances, judgments, and any

11   anticipated or unexpected financial gains to the outstanding

12   court-ordered financial obligation, or in a lesser amount to be

13   determined by the Court upon the recommendation of the probation

14   department.

15        The defendant shall provide the probation officer

16   access to any requested personal or business related financial

17   information.  Defendant shall not open any new lines of credit

18   or bank accounts without the advance approval of the probation

19   office.  The defendant shall notify all current and future

20   employers of the offense of conviction, and provide written

21   verification as directed by the probation office.

22        The defendant shall participate in a program approved

23   by the United States Probation Office for mental health

24   treatment.  The cost of this program is to be paid by the

25   defendant as directed by the probation officer.

1        Even though use of cannabis in the Commonwealth of

2   Virginia is legal, the defendant shall not use marijuana or

3   cannabis in any form, unless he receives a doctor's prescription

4   for the pain that he is suffering from his medical condition.

5        The Court will impose a special assessment of $100,

6   pursuant to statute.

7        Counsel, do you have a copy of the notice of right to

8   appeal sentence under limited circumstances?

9        MR. PEASE:  I do, Your Honor.

10        THE COURT:  If you could have your client endorse that

11   and hand that up to the Court, we'll make that part of the

12   record.

13        I also ask, because of the new disposition set out by

14   the Fourth Circuit, and I will inquire herein, does the

15   defendant or his counsel have any objections to the conditions

16   of probation articulated by the Court?

17        MR. PEASE:  No, Your Honor.

18        May I ask -- I just want to make sure I heard

19   Your Honor currently.  The sentence the Court is imposing is,

20   did you say six months in prison?

21        THE COURT:  Six months of actual incarceration,

22   24 months of home confinement.  In other words, it's a 30-month

23   sentence, but I'm going to allow him to serve 24 months of it in

24   home confinement.

25        Yes, ma'am?

1          THE PROBATION OFFICER:  Sorry, Your Honor, I just want

2     to clarify.  The 24 months of home confinement would have to be

3     a condition of supervised release.

4          THE COURT:  Yes, we'll do it that way.  What I want you

5     to do is formulate it in a way that's consistent with the

6     requirements that the probation office needs to do to accomplish

7     its objective.

8          THE PROBATION OFFICER:  Yes.  So it would be a

9     six-month imprisonment sentence, and then, as a special

10     condition of supervised release, it would be 24 months of --

11          THE COURT:  Do you have any objection to that, counsel?

12          MR. PEASE:  No, Your Honor.

13          THE COURT:  Okay.  Yes, ma'am.

14          THE PROBATION OFFICER:  Thank you, Your Honor.

15          THE COURT:  The Court will enter the document entitled

16     "Notice of Right to Appeal Sentence Under Limited

17     Circumstances," and make it part of the record in this matter.

18          I'll state for the record that the matter was very well

19     argued both by the government and by counsel for the defense.

20     Mr. Sotomayor, I struggled with this case a lot, because it's

21     sad, quite frankly.  As a matter of fact, it's a case that I'll

22     probably share with my family, with our military background, as

23     to how, as you put it, one can lose their way.  But the Court

24     has taken into consideration a whole lot of things, particularly

25     your statement, the statement of your counsel, and essentially

1    gave you the benefit of the doubt here that you'll never do this

2    again.

3            So, sir, I hope you take full advantage, in a positive

4    way, of the disposition of the Court, and I hope that you're

5    able to put your life back in order to some degree.

6            THE DEFENDANT:  Yes, sir.

7            MR. PEASE:  Your Honor, if I may, we would ask the

8    Court, respectfully, to recommend to the Bureau of Prisons

9    designation to a facility as close as possible to Alexandria,

10   Virginia.

11           THE COURT:  I can do that.  What I would suggest is

12   that you give me one that you want me to recommend, because if I

13   don't have a specific recommendation, the Bureau of Prisons will

14   do whatever they want to do.

15           I'm assuming you also want to ask for a report date?

16           MR. PEASE:  Yes, Your Honor.  I would ask that the

17   defendant remain on release until he has a report date from the

18   Bureau of Prisons.  I talked to Mr. Sullivan about that; the

19   government has no objection.  He's complied with all the

20   conditions of his pretrial release.

21           THE COURT:  I'm going to direct that he report no later

22   than January 2nd, 2024.  That will get him through the holidays,

23   and might well put him in a position to understand the

24   significance of having time with your family during the

25   holidays, and the loss that he's going to sustain for that next

1    six months by not being home with his family.

2         January 2nd, 2024, Mr. Sotomayor.  Your counsel will

3    discuss with you the means and facility for you to meet your

4    obligation in that regard.  Understand that failing to appear -

5    I'm not suggesting that you would do that - is a violation of

6    the requirements of your sentence, and will be dealt with in an

7    unfavorable way for you.

8         Do you have any questions, sir?

9         THE DEFENDANT:  No, sir.  I shall comply as you say.

10        THE COURT:  All right.  Any questions from the

11   government?

12        MR. SULLIVAN:  No, Your Honor.  We do have a couple of

13   housekeeping matters.

14        THE COURT:  Do you have a couple of motions on the

15   Count II and Count III, IV, V, and VI?

16        MR. SULLIVAN:  Yes.  So we did it as a written motion

17   to dismiss Counts II through VI.  Would the Court prefer us to

18   put it through the ECF system?

19        THE COURT:  Let's just go ahead and do it now, if you

20   like.

21        Any objection to that.

22        MR. PEASE:  Certainly not, Your Honor.

23        MR. SULLIVAN:  And we also have a consent order of

24   forfeiture signed by the parties, and a restitution order signed

25   by the parties.

57

1          THE COURT:  Which will also be made part of the record.

2          The consent order of forfeiture and the restitution

3     order have been endorsed and made a part of the record in this

4     matter.

5          Anything else we need to do?

6          MR. SULLIVAN:  Not from the government.

7          MR. PEASE:  No, Your Honor.

8          THE COURT:  Very good.

9          (Off the record at 11:44 a.m.)

10

11

12

13

14

15

16          **CERTIFICATE OF OFFICIAL COURT REPORTER**

17

18          **I, Rebecca Stonestreet, certify that the foregoing is a**

19     **correct transcript from the record of proceedings in the**

20     **above-entitled matter.**

21

22

23

24     **___//Rebecca Stonestreet//___          __10/3/23____**

25     **SIGNATURE OF COURT REPORTER                    DATE**