IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 1:22-CR-00122 (RDA) |
| | ) |
| JULIO R. SOTOMAYOR | ) |
| (a/k/a "JACE SOTOMAYOR"; "J.R. | ) |
| SOTOMAYOR"; "WIZARD"), | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S FOURTH MOTION TO MODIFY OR TERMINATE CONDITIONS OF SUPERVISED RELEASE**

The United States of America respectfully submits this opposition to defendant Julio R. Sotomayor's "Motion to Terminate Supervised Release or, in the Alternative, Eliminate Home Confinement as a Condition of Release." ECF No. 71. The U.S. Probation Office ("USPO") opposes the defendant's request, noting in communications with defense counsel that such an outcome would result in an even greater sentencing disparity with his co-conspirator, Diane Sturgis, who received a 24-month term of imprisonment for a related scheme. The government concurs with the USPO's position. His motion should be denied.

The defendant's current motion, which is his *fourth* effort to modify or eliminate the conditions of his supervised release in less than a year, leaves little doubt that the defendant does not truly believe his corrupt conduct, including his involvement in *four* different bribery or procurement fraud schemes, was that serious or inappropriate. During the sentencing hearing, the government argued to the Court that this defendant is not particularly remorseful; his misconduct is severe, repetitive, and serious; and he has gamed the system to his advantage at every turn. The recent procedural history of this case alone demonstrates that the government's misgivings at the time were, in fact, well founded. The defendant has filed motion after motion,

typically without conferring with government counsel, to chip away at the terms of his home confinement and erode the other conditions of his supervised release.  His current request goes too far, and it is not quite hyperbole to say that the defendant now spends almost as much time outside his house as he does within it.

According to the USPO, the defendant spends three hours running errands every Friday. He attends church services for 2.5 hours every Sunday.  He is allowed three 30-minute sessions daily to exercise and walk around his neighborhood to help with his blood circulation and any other health-related concerns.  The USPO has also approved most of the defendant's timeout requests so he can go to the library or attend to his medical care.  These timeouts, according to the USPO, include the following over the last two months alone:

> May 15, 2025:  8:45 a.m. to 1:15 p.m., doctor's visit (4.5 hours)
> May 22, 2025:  9 a.m. to 2 p.m., doctor's visit (5 hours)
> June 3, 2025:  9:30 a.m. to 1:30 p.m., doctor's visit (4 hours)
> June 4, 2025:  1:30 p.m. to 4:30 p.m., library visit (3 hours)
> June 5, 2025:  10 a.m. to 12 p.m., doctor's visit (2 hours)
> June 12, 2025:  2:30 p.m. to 5:30 p.m., library visit (3 hours)
> June 26, 2025:  1:30 p.m. to 4:30 p.m., library visit (3 hours)
> July 2, 2025:  9:30 a.m. to 1:30 p.m., doctor's visit (4 hours)
> July 10, 2025:  2:30 p.m. to 5:30 p.m. doctor's visit (3 hours)

The USPO has also expressed concern to defense counsel that the defendant may be abusing the conditions of his supervisory release (or at least bending the spirit of the rules) by using his takeouts as an opportunity to go places not included in the Court's recent orders.

I.      **Procedural History**

Contrary to the defendant's assertion, he did not "accept[] responsibility immediately and express[] deep remorse for his actions." ECF No. 71 at 8.  The defendant, in fact, refused to agree to a preindictment resolution despite overwhelming evidence of his guilt in connection with multiple schemes.  Consequently, on July 6, 2022, a federal grand jury in the Eastern

District of Virginia returned a six-count indictment charging the defendant with engaging in a bribery and fraud scheme with Sturgis, a former contracting officer for the Broadcasting Board of Governors (BBG) (now known as the U.S. Agency for Global Media).  ECF No. 1.

On January 30, 2023, after extensive pretrial discovery and litigation, the defendant did an about face and pleaded guilty to Count 1 of the indictment (conspiracy to commit bribery and honest services wire fraud), which had the immediate benefit of capping his liability at 60 months, the statutory maximum.  ECF No. 33.  As part of the statement of facts in support of his guilty plea, the defendant,[1] a retired colonel in the U.S. Air Force (USAF), admitted that he had orchestrated *four* different corrupt schemes, including the one to which he pleaded guilty.  The four schemes include the following:

- First, the defendant and Sturgis agreed to engage in a corrupt, multi-year scheme in which Sotomayor, through his shell consulting company, Eagle Market Group (EMG), paid $150,000 to Sturgis using her relative (Person A) as a pass through intermediary.  In exchange for these payments, Sturgis, among other things, performed official acts to benefit the defendant, his consulting companies, Company B, and Person B.  ECF No. 34

---

[1] The defendant is the minority owner of Company B, a government contracting firm in Virginia.  While serving as Company B's minority owner, the defendant used EMG and his other pass-through consulting company, Federal Security Agency (FSA), to provide consulting services to Company B and serve as subcontractors to Company B.  ECF No. 34 at 1-3 (¶¶ 1, 5-6, 9); PSR ¶¶ 32, 36-37, 40.

Company B received several small contracts and purchase orders from the BBG that were awarded and supervised by Sturgis, including a blanket purchase agreement.  Beginning in 2014, the defendant and Company B's majority owner, Person B, sought to use the blanket purchase agreement with the BBG as a contracting vehicle to provide supplies and services to USAF to support technology projects and innovative initiatives ("BBG/USAF contract"). Using military interdepartmental purchase agreements and Company B's blanket purchase agreement with the BBG, Sturgis awarded purchase orders and contract modifications to Company B that were worth approximately $31.8 million (through September 2017).  Company B received another $19.8 million on the BBG/USAF contract from late 2017 (after Sturgis's retirement) through early 2020.  The defendant, in turn, received approximately *$5.9 million* (through October 2020) while serving as Company B's liaison with the USAF and the BBG and Sturgis. ECF No. 34 at 2-3 (¶¶ 6-9); PSR ¶¶ 37-40.

3

at 3-4 (¶¶ 10-16); PSR ¶¶ 42-48.  The defendant and Sturgis took several steps to conceal the scheme.  *Id.*

- Second, the defendant used EMG to engage in similar scheme with Juan Carlos Arevalo, a high-ranking USAF contractor.  Arevalo served as a senior technical consultant and chief technologies officer for a USAF division in the Pentagon.  Between late December 2013 and late October 2019, the defendant, through EMG, made $185,000 in payments to Arevalo by issuing periodic check payments to Arevalo's relative purportedly for consulting work.  Arevalo's relative did not perform any services for the defendant or EMG.  Sotomayor made the payments to Arevalo at least in part to influence Arevalo to perform official acts and cause other officials to perform official acts benefitting the defendant, his consulting companies, Company B, and Person B.  In exchange for the payments, Arevalo performed official acts and caused others to perform official acts, and Arevalo provided preferential treatment to the defendant, his consulting companies, and Company B and Person B, including with respect to the same BBG/USAF contract involving Sturgis and the BBG.  ECF No. 34 at 14 (¶ 75); PSR ¶ 108.

- Third, between early 2015 and mid-2019, the defendant and others executed a scheme to defraud the United States and the BBG.  The defendant and Person B submitted, and caused others to submit, invoices from Company B to the USAF that included requests to pay government servicing fees that were supposed to be for the BBG.  Substantial portions of the government servicing fees were not used for the benefit of the BBG; instead, the funds were paid to the defendant.  ECF No. 34 at 15 (¶ 76); PSR ¶ 109.

- Fourth, the defendant engaged in a separate, "double-dipping" scheme to defraud, which involved another government contracting firm in Virginia, Company D, and its owners and officers, Persons D1 and D2.  Company D, with the defendant's assistance, primarily received government contracts with the Defense Information Systems Agency (DISA).  The defendant received compensation from Company D in the form of payments to EMG or the defendant's wife for providing program management services to Company D related to the DISA contract.  At the same time, the defendant was providing contract management services to DISA and receiving payments to his consulting firm, FSA, for overlapping work on the same contract.  Company B also served as a subcontractor on Company D's contracts with DISA.  ECF No. 34 at 15 (¶ 77); PSR ¶ 110.

On August 30, 2023, the Court rejected the government's request for a 37-month sentence and, instead, sentenced the defendant to a term of imprisonment of six months, to be followed by three years of supervised release with the special condition that the first 24 months be served in home confinement.  ECF Nos. 61, 62.  In doing so, the Court disagreed with the government and the USPO's recommendation to apply the same four-level enhancement that had

4

already been applied to Sturgis during two separate sentencing hearings. *Id.*; *see also* U.S.S.G. § 2C1.1(b)(3).

Because the defendant's various schemes resulted in payments to him totaling at least $5.9 million, he was easily able to prepay his restitution and forfeiture payments, totaling $605,000, prior to his sentencing hearing. The Court appeared to give this fact, as well as the defendant's military background, considerable credit when meting out the defendant's punishment. The Court specifically granted the defendant's request for an unusually large downward departure and variance. ECF Nos. 49, 58, 61, and 62.

At the conclusion of the sentencing hearing, the defendant requested and received permission to delay his report date until after the holiday season. He also asked to serve his time at a minimum security prison camp in Pensacola, Florida, at least in part so he could spend time with his adult daughter who was stationed there. ECF No. 61. According to defense counsel, the defendant reported to FTC Pensacola on January 2, 2024, and was released to a halfway house in Baltimore on April 23, 2024, less than four months later. ECF No. 71 at 1-2.

On August 23, 2024, the defendant filed his first motion to amend the conditions of his supervised release, asking for permission to: (1) escort his wife to and from her medical appointments, which reportedly occur at least two or three times per month, and to remain with her for the duration of these appointments; and (2) to leave his home each week for up to two hours to visit two libraries. ECF No. 65. The Court granted the defendant's motion on August 28, 2024. ECF No. 66.

Less than four months later, on December 19, 2024, the defendant filed his second motion to amend the conditions of his supervised release. ECF No. 67. This time, the defendant sought permission to: (1) leave his home each week for up to three hours to visit libraries,

5

including a third library supposedly housed within his golf and tennis country club (where the defendant also wanted to use the conference rooms, a small gym, and professional work areas to allow the defendant to have business meetings, professional contacts, and discussions in a professional setting in addition to conduct professional research and learning); (2) leave his home for Christmas and Christmas Eve religious services; (3) leave his home for an additional period of up to three hours of time out each month to attend to personal appointments and household related chores; (4) leave his home to attend professional conferences, classes, lectures, and educational/business seminars in the D.C. metro area; and (5) leave his home to visit his daughter and new grandchild in Newport News, Virginia. *Id.*

The defendant did not consult with government counsel before filing this motion. The Court ruled on the motion on the same day, before the government could oppose. ECF No. 68. The Court granted most of the defendant's requests but denied his request to add his golf and tennis country club to the list of approved libraries that he could visit. *Id.*

Four months later, on May 2, 2025, the defendant filed his third motion to amend the conditions of his supervised release. ECF No. 69. This time, the defendant sought permission to have his ankle monitor removed in connection with a medical procedure. Again, the defendant did not consult with the undersigned before filing the motion (although, in this instance, the government would not have opposed the request if it had been so notified). The Court granted the motion on May 5, 2025. ECF No. 70.

Two months later, on June 30, 2025, the defendant filed his fourth motion. ECF No. 71. Because defense counsel, again, did not confer with the government before filing the current motion, the government immediately sent an email to chambers, copying defense counsel, to

6

express its intent to file a response. The Court issued an Order on July 1, 2025, asking the government to file its response by July 22, 2025. ECF No. 72.

II. **Argument**

    A. **The Court Should Not Terminate the Defendant's Supervised Release**

The defendant seeks to terminate the remaining portion of his supervised release pursuant to 18 U.S.C. § 3583(e). This Court has the discretion to terminate, extend, revoke, and modify a previously imposed term of supervised release. *See United States v. Jafari* , No. CV 1:22-CR-00197 (RDA), 2025 WL 950404, at *2 (E.D. Va. Mar. 28, 2025) (denying motion for early termination of supervised release); *United States v. Cook*, No. 1:20-CR-6-2 (RDA), 2024 WL 712529, at *2 (E.D. Va. Feb. 21, 2024) (holding same); *United States v. Mohammed*, No. 1:10-CR-385 (RDA), 2024 WL 2060122, at *3 (E.D. Va. May 8, 2024) (holding same), *aff'd*, No. 24-6512, 2024 WL 3949328 (4th Cir. Aug. 27, 2024); *United States v. Zilevu*, No. 1:19-CR-356 (RDA), 2024 WL 287698, at *2 (E.D. Va. Jan. 25, 2024) (denying motion for early termination of supervised release without prejudice); *United States v. Dumas*, No. 1:13-CR-286-1 (RDA), 2024 WL 4294637, at *2 (E.D. Va. Sept. 25, 2024) (holding same). The defendant "bears the burden of demonstrating that early termination of supervised release is warranted." *Cook*, 2024 WL 712529, at *2 (citing cases).

Section 3583(e) provides that a court may terminate a term of supervised release "after the expiration of one year of supervised release," "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)," when "warranted by the conduct of the defendant released and the interest of justice"). The government acknowledges that the defendant has served more than one year of his supervision term and therefore may be considered for early termination.

express its intent to file a response. The Court issued an Order on July 1, 2025, asking the government to file its response by July 22, 2025. ECF No. 72.

II. **Argument**

    A. **The Court Should Not Terminate the Defendant's Supervised Release**

The defendant seeks to terminate the remaining portion of his supervised release pursuant to 18 U.S.C. § 3583(e). This Court has the discretion to terminate, extend, revoke, and modify a previously imposed term of supervised release. *See United States v. Jafari* , No. CV 1:22-CR-00197 (RDA), 2025 WL 950404, at *2 (E.D. Va. Mar. 28, 2025) (denying motion for early termination of supervised release); *United States v. Cook*, No. 1:20-CR-6-2 (RDA), 2024 WL 712529, at *2 (E.D. Va. Feb. 21, 2024) (holding same); *United States v. Mohammed*, No. 1:10-CR-385 (RDA), 2024 WL 2060122, at *3 (E.D. Va. May 8, 2024) (holding same), *aff'd*, No. 24-6512, 2024 WL 3949328 (4th Cir. Aug. 27, 2024); *United States v. Zilevu*, No. 1:19-CR-356 (RDA), 2024 WL 287698, at *2 (E.D. Va. Jan. 25, 2024) (denying motion for early termination of supervised release without prejudice); *United States v. Dumas*, No. 1:13-CR-286-1 (RDA), 2024 WL 4294637, at *2 (E.D. Va. Sept. 25, 2024) (holding same). The defendant "bears the burden of demonstrating that early termination of supervised release is warranted." *Cook*, 2024 WL 712529, at *2 (citing cases).

Section 3583(e) provides that a court may terminate a term of supervised release "after the expiration of one year of supervised release," "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)," when "warranted by the conduct of the defendant released and the interest of justice"). The government acknowledges that the defendant has served more than one year of his supervision term and therefore may be considered for early termination.

This Court, on more than one occasion, has explained the legal standard for early termination:

> In determining whether early termination of supervised release is appropriate, the Court must first consider the following factors set forth in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence ... to afford adequate deterrence to criminal conduct; ... to protect the public from further crimes of the defendant; and ... to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment ...;" (3) "the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;" (4) "any pertinent policy statement ...;" (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and (6) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a). Second, the Court must consider whether early termination is "warranted by the conduct of the defendant." 18 U.S.C. § 3583(e)(1). Third, the Court must consider whether early termination is in "the interest of justice." *Id.*

*Cook*, 2024 WL 712529, at *2.

### 1.    Section 3553(a) Does Not Warrant Early Termination

The sentencing factors set forth in 18 U.S.C. § 3553(a) do not justify the defendant's request to terminate his supervised release. The defendant pleaded guilty to a serious public corruption offense, which was only the tip of a very large iceberg. Based on the extensive investigation in this case, the government is skeptical that the defendant has "learned his lesson," as he claims in his motion. Nor has he "paid a heavy price" from the government's perspective. ECF No. 71 at 10.

From the moment he left the military in 2010, the defendant began one corrupt scheme after another and engaged in multiple acts of bribery and fraud. His entire defense contracting business was built on a foundation of lies, deceit, and corruption. The defendant has repeatedly

8

emphasized his distinguished military career to offset his criminal conduct. However, it is the same military background, and the connections he developed while serving in the USAF, that he exploited and traded upon to build his lucrative, alter-ego companies. Nearly all the millions of dollars that he generated for EMG and FSA (and the tens of millions more for his business partners) is derived from tainted contracts that he and his partners would not have received but for his criminal and recalcitrant behavior. Whatever distinctions and awards the defendant achieved during his military career have now been tarnished by his dishonorable conduct and his effort to line his own pockets through corrupt means.

 Early termination would also not provide adequate deterrence to the defendant or others. At the defendant's behest and urging, both Sturgis and Arevalo breached the public trust bestowed upon them. The defendant greased the skids on both sides of the BBG/USAF contract. He bribed the contracting officer, Sturgis, and he bribed the USAF technical officer, Arevalo, with $150,000 and $185,000 in bribe payments, respectively. In exchange, Sturgis and Arevalo agreed to perform official acts and provide preferential treatment to a contracting firm, Company B, that received nearly $50 million dollars in taxpayer money because of the scheme. The defendant took steps to conceal his illegal activity with both Sturgis and Arevalo, including using personal e-mail accounts, setting up a shell company for Sturgis's relative, and using their relatives as conduits. Both schemes damaged and undermined the BBG and the USAF's reputation and their procurement integrity.

 The defendant received a sentence of six months imprisonment, which was far below the guidelines range as determined by the Court (and even further below the guideline calculations recommended by the government and the USPO). Moreover, as the government argued during sentencing, its proposed recommendation of 37 months had already afforded the defendant

several substantial benefits. In addition to the recommendation contained in its sealed filing, *see* ECF No. 43, the government had already afforded the defendant considerable leniency during the plea negotiation process. First, the government agreed to accept a guilty plea that focused on the conspiracy count, which automatically limited the defendant's exposure to 60 months (far below the maximum penalties for the substantive counts in the indictment). Second, the government focused the loss amount on the multiple bribe payments to Sturgis, the public official, as opposed to the tens of millions of dollars that the defendant and his business partners received pursuant to the corrupt contract. Third, the parties negotiated a fixed amount of monetary penalties totaling $605,000, which is a substantial discount given the corrupt contract's significant revenue. The government was willing to discount the financial penalties in part because the defendant expressed a commendable interest in paying them in full at sentencing. The defendant did so, however, because he can easily afford to do so given the vast sums he made on tainted government contracts. Fourth, the government applied the low end of the applicable guideline range when calculating and recommending its proposed sentence.

Although the Court imposed a term of imprisonment below the advisory guidelines, the judgment included a three-year term of supervised release—the maximum period permitted—and included a special condition of home confinement for two years. ECF Nos. 61, 62, 64. The Court did so, perhaps, to counterbalance the substantial downward variance and departure that it granted during the sentencing hearing. When confronted with similar situations, this Court, on more than one occasion, has emphasized the need for deterrence:

> Terminating Defendant's term of supervision early, where the term was such a vital part of his sentence, would undermine the deterrent message the Court intended to send to Defendant and other would-be criminals that engaging in similar conduct will have significant consequences. Additionally, Defendant has already received significantly lesser penalties than similarly

> situated defendants, and so early termination would only exacerbate sentencing disparities. Accordingly, while the Court acknowledges that Defendant has satisfied his restitution [and forfeiture] requirements, Court finds that the nature and circumstances of Defendant's offense, the need for deterrence, and the need to avoid sentencing disparities, strongly militate against early termination.

*Cook*, 2024 WL 712529, at *2. *See also Mohammed*, 2024 WL 2060122, at *4 (quoting *Zilevu*, 2024 WL 287698, at *3); *Dumas*, 2024 WL 4294637, at *2.

The defendant's background and personal characteristics—including his age, current health condition, and record of military service—do not warrant early termination either. As discussed during the sentencing phase, the defendant has certain medical conditions that are relatively common for middle-aged men. PSR ¶¶ 147-155; ECF No. 71 at 2. Sotomayor's overall health and the somewhat commonplace nature of his limited conditions for a person of his age do not warrant special consideration, particularly since he has already received modifications of his supervised release conditions to accommodate some of these concerns, and the USPO has taken additional steps to accommodate the defendant's health-related requests.

As noted above, the defendant has repeatedly and somewhat reflexively emphasized his decorated military history as a basis for leniency during sentencing and now. However, this same service in the military is what the defendant capitalized on to defraud the country he served on multiple occasions. His military service makes him more culpable, not less, and it should not now serve as a reward or basis to terminate his supervised release.

The defendant also claims that, had he been sentenced more recently, he likely would have received a lesser punishment because he would have qualified as a zero-point offender pursuant U.S.S.G. § 4C1.1. ECF No. 71 at 9-10. This argument is speculative at best. It assumes, among other things, that the government's plea negotiation position would have been

11

identical in this hypothetical scenario. It further assumes that the Court's position would otherwise have been static, and that the Court would not have recalibrated its position by focusing more heavily on factors such as the defendant's other relevant, criminal conduct. PSR ¶¶ 108-110.

### 2. The Defendant's Conduct While on Supervised Release

The defendant argues that his conduct and behavior have been "exemplary," and the fact that he has complied with his conditions of supervised release weighs in favor of early termination. ECF No. 71 at 2, 3. As a preliminary matter, the USPO has expressed some minimal concern that the defendant may not be fully compliant during his takeout periods. In any event, "compliance is simply the baseline of what is expected and is not, in and of itself, proper justification for early termination." *Cook*, 2024 WL 712529, at *2. As this Court has observed on several occasions:

> Courts within the Fourth Circuit have made clear that "compliance with the terms of supervised release is not itself sufficient to warrant termination." *Smith v. United States*, No. 2:16-CR-51, 2023 WL 8586680, at *7 (E.D. Va. Dec. 11, 2023). Importantly, "[e]ven model prison conduct and full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release and does not warrant early termination." *Id.* (quotations and citation omitted).

*Cook*, 2024 WL 712529, at *2; *see also Jafari*, 2025 WL 950404, at *2; *Zilevu*, 2024 WL 287698, at *2.

This factor, when applied here, is neutral at best, and the Court should not afford it significant weight. The fact that the defendant has not been arrested or convicted of any new crimes and has otherwise complied or partially complied with his supervisory conditions is not to be lauded—it is what is expected and required of him to maintain his freedom.

12

### 3. The Interests of Justice

The "interest of justice" provision in § 3583(e)(1) provides the Court with wide latitude "to consider a broad range of factors in addition to an individual's behavior in considering whether to terminate the supervised release period." *Cook*, 2024 WL 712529, at *3 (quoting *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999)). Here, for the foregoing reasons, justice dictates that the Court deny the defendant's request for early termination of his supervised release, particularly if there are concerns that he is abusing the terms of his takeouts. Yet, even if he is fully compliant, "continued supervision is supported by [the] [d]efendant's apparent success under the program—the structure and guidance he has received under supervised release has helped him "becom[e] [a] law-abiding citizen." Cook, 2024 WL 712529, at *3 (citation omitted).

### B. The Court Should Not Further Modify the Defendant's Supervisory Conditions By Eliminating Home Confinement

The defendant argues in the alternative that the Court should terminate his home confinement requirements, focusing mostly on his need to attend to his own medical appointments and those of his wife. *E.g.*, ECF No. 71 at 1-3, 11. The defendant overlooks the fact that he has already asked for such accommodations as part of his four prior motions. His current complaints therefore ring hollow. He also claims that he is the "primary caregiver" for his wife, *id.* at 2, but the same could be said of most couples in their 60s whose adult children do not live with them. Although implied by defense counsel, the term "primary caregiver" in this instance does not mean that the defendant's wife is so disabled that she cannot attend to her own medical appointments. The defendant, in any event, has provided no medical records to suggest otherwise.

### III.     Conclusion

For the foregoing reasons, the government respectfully submits that the defendant's motion should be denied in its entirety.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Edward P. Sullivan
Acting Chief, Public Integrity Section

By:  *[signature]*
Edward P. Sullivan
Special Assistant United States Attorney (LT)
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Tel:  (703) 299-3700
Fax:  (703) 299-3981
Edward.P.Sullivan@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

*/s/ Edward P. Sullivan*
Edward P. Sullivan
Acting Chief, Public Integrity Section
Special Assistant United States Attorney (LT)

Dated:  July 22, 2025